# UNITED STATES NAVY-MARINE CORPS
# COURT OF CRIMINAL APPEALS
# WASHINGTON, D.C.

**Before**
**F.D. MITCHELL, K.J. BRUBAKER, M.C. HOLIFIELD**
**Appellate Military Judges**

**UNITED STATES OF AMERICA**

**v.**

**JACOB L. PEASE**
**INFORMATION SYSTEMS TECHNICIAN SECOND CLASS (E-5), U.S. NAVY**

**NMCCA 201400165**
**GENERAL COURT-MARTIAL**

**Sentence Adjudged:** 13 December 2013.
**Military Judge:** CAPT J.K. Waits, JAGC, USN.
**Convening Authority:** Commander, Navy Region Europe, Africa, Southwest Asia, Naples, Italy.
**Staff Judge Advocate's Recommendation:** CDR J.A. Link, JAGC, USN.
**For Appellant:** Eric Montalvo, Esq., Civilian Defense Counsel; Lt Carrie E. Theis, JAGC, USN.
**For Appellee:** LT Amy L. Freyermuth, JAGC, USN; Capt Matthew M. Harris, USMC.

**14 July 2015**

---
**PUBLISHED OPINION OF THE COURT**
---

BRUBAKER, Senior Judge:

A panel of members with enlisted representation sitting as a general court-martial convicted the appellant, contrary to his pleas, of two specifications of fraternization in violation of a lawful general order, three specifications of sexual assault, and one specification of abusive sexual contact, in violation of Articles 92 and 120, Uniform Code of Military Justice, 10 U.S.C. §§ 892 and 920. The members sentenced the appellant to six

years' confinement and a dishonorable discharge.  The convening authority approved the sentence as adjudged.

The appellant now raises five assignments of error (AOE):

1.  The military judge improperly applied Military Rule of Evidence 413 to charged misconduct;

2.  The evidence is legally and factually insufficient;

3.  The military judge erred in failing to give a requested instruction;

4.  Article 120 is unconstitutionally vague; and

5.  The military judge abused his discretion in admitting expert testimony.

After carefully considering the record of trial and the pleadings and oral arguments of the parties, we find the sexual assault and sexual contact convictions factually insufficient. Arts. 59(a) and 66(c), UCMJ.  Having considered the appellant's assertion that the fraternization convictions were legally and factually insufficient, we find they are legally and factually sufficient and affirm them.  *United States v. Clifton*, 35 M.J. 79, 81-82 (C.M.A. 1992).  The remaining AOEs are mooted by our decision.

### Factual Background

At all relevant times, the appellant, Information Systems Technician Seaman (ITSN) S.K.,[1] and Information Systems Technician Second Class (IT2) B.S. were stationed in the radio division of the communications department aboard the USS MOUNT WHITNEY (LCC 20), homeported in Gaeta, Italy.  The appellant was a work center supervisor within the division and, as such, had task-related assignment and supervisory authority over ITSN S.K. and IT2 B.S.[2]  ITSN S.K. and IT2 B.S. alleged that, in separate

---

[1]  By the time of trial, ITSN S.K. had been promoted; however, for simplicity, we shall refer to her by her rank at the time of the allegation.

[2]  According to ITSN S.K., the appellant was just below the division lead petty officer and as such "[r]an the shop," Record at 470, including reading the plan of the day, taking daily muster, and being in charge of other daily activities within the work center.

2

incidents, the appellant sexually assaulted them.  We address each incident in turn.

**ITSN S.K.**

On 6 December 2012, ITSN S.K., who had only recently reported aboard the MOUNT WHITNEY, went out in town with some shipmates.  Although she was neither able to recall the type or quantity of alcohol she consumed, nor how much or when she ate that day, she did remember that they started at a bar called "The Dutch."  ITSN S.K. reported she began feeling "tipsy"[3] while at "The Dutch."  The group then went to another bar called "Anna's."  On the way, ITSN S.K. encountered the ship's shore patrol consisting of Chief Warrant Officer 3 (CWO3) G.B.——who happened to be the division officer for the appellant and the two complainants——and Information Systems Technician First Class (IT1) J.V.  According to both CWO3 G.B. and ITSN S.K., the former issued a generic warning to the effect to behave themselves and that he did not want to see ITSN S.K. "out all night."[4]

Once at "Anna's," ITSN S.K. drank beer and shots of hard liquor and began to feel "drunk, blurry, starting to get -- everything started to get hazy."[5]  She continued to walk back and forth between "Anna's" and a third bar, "Monique's," located a few storefronts away.  Sometime later, ITSN S.K. had a second encounter with shore patrol, and at this point it is uncontroverted she was ordered back to the ship.

CWO3 G.B. testified that while on shore patrol, he would make "conservative calls,"[6] erring on the side of caution regarding when to direct Sailors to return to the ship—particularly for Sailors within his own division.  On the evening in question, he directed ITSN S.K. to return to the ship because "when I looked at her, I could tell that she had been drinking pretty heavily . . . .  I'm not an expert by any means, but I mean I can tell, based on my experience, when they are getting to that point, and I thought that [ITSN S.K.] was

---

[3]  Record at 475.

[4]  *Id.* at 479.  IT1 J.V., however, recalled that during this encounter, ITSN S.K. was "stumbling," and that CWO3 G.B. ordered her back to the ship at that point, an order ITSN S.K. did not obey.  *Id.* at 437.

[5]  *Id.* at 479.

[6]  *Id.* at 905-06.

getting to that point."[7]  He reported, however, that she was aware of her surroundings, able to engage in conversation, and able to walk without falling.  IT1 J.V. corroborated this second encounter with shore patrol, but recalled ITSN S.K. appeared even more intoxicated than during the first, noting that she was leaning on another female for support because she was "wobbling and using [her] to stand up."[8]

According to CWO3 G.B., although he told ITSN S.K. to return to the ship, he ran into her again later that evening at "Anna's."  He asked why she had not returned to the ship, and she replied she was looking for her pocketbook, which she left at "Monique's."  CWO3 G.B. then escorted her to "Monique's" to retrieve the purse.  At this point, she recalled "swaying and trying to concentrate,"[9] but CWO3 G.B. indicated she was aware of her surroundings and able to walk and talk without difficulty.

CWO3 G.B. testified that as they left "Monique's" they encountered the appellant, whom CWO3 G.B. directed to escort ITSN S.K. back to the ship.[10]  IT1 J.V., in a slightly different recollection, stated he observed ITSN S.K. speaking to the appellant at the bar for approximately five minutes and the appellant thereafter volunteered to walk ITSN S.K. back to the ship.[11]  The only other witness to testify to the level of ITSN S.K.'s intoxication that evening stated she interacted with ITSN S.K. briefly throughout the night and she was not "fall-down drunk."[12]

CWO3 G.B. and IT1 J.V. decided to walk back to the ship themselves and followed ITSN S.K. and the appellant.  They observed ITSN S.K. able to walk on her own without falling or stumbling.  They witnessed her navigate the gate, negotiate the ladder well, request and obtain permission to come aboard, and scan her identification without any issue.  At this point, CWO3 G.B. and IT1 J.V. parted from ITSN S.K. and the appellant.

---

[7]  *Id.* at 909.

[8]  *Id.* at 441.

[9]  *Id.* at 480.

[10]  *Id*. at 911.

[11]  *Id*. at 442-43.

[12]  *Id*. at 669.

ITSN S.K. and the appellant proceeded from the quarterdeck to the smoke deck. ITSN S.K. testified she only remembered flashes of the rest of the evening. She recalled being on the smoke deck smoking a cigarette, telling the appellant she thought "he was cute" and that they kissed.[13] The next thing ITSN S.K. remembered was being "in the JOC[14] having sex."[15] ITSN S.K. recalled that she was lying back on a table and holding her weight up by propping her elbows on the table. The appellant was standing in front of her while they engaged in vaginal intercourse. She testified at trial——although she had not reported this in previous statements or testimony——that afterward, "he smacked my face and kept hold of it and like focused my attention on him and said, 'Don't tell -- don't ever tell anyone.'"[16] Her next memory was waking up in the morning in her rack in berthing.

Once awake, ITSN S.K. couldn't find her identification card or purse, but noted a condom wrapper in her clothes. She "could tell that I'd had sex, and I just remember knowing it had happened . . . ."[17] She approached Operations Specialist Second Class (OS2) T.B., a social acquaintance and officer of the deck that morning, to ask how she could report her lost items. According to OS2 T.B., ITSN S.K. indicated she had been "messing around or fooling around"[18] with someone in the JOC the previous night. She thought the purse and identification might be there, but did not know the combination and said it would be embarrassing to go ask the person she was with to let her back into the JOC. To him, she was not flustered and appeared happy, normal, and sober.

ITSN S.K. eventually found her identification card and met up with her shipmates to attend a unit-sponsored event. A friend, Information Systems Technician Third Class (IT3) D.F., reported ITSN S.K. was late but seemed fine, coherent, "happy and her normal self."[19] He also testified that ITSN S.K. told

---

[13]  *Id.* at 482-83.

[14]  The Joint Operations Center is frequently referred to as the JOC.

[15]  Record at 483.

[16]  *Id.* at 486.

[17]  Record at 488.

[18]  *Id*. at 1004.

[19]  *Id*. at 1018.

him in a normal demeanor that she had sex with the appellant the night before.  However, in cross-examination, IT3 D.F. conceded that she also said, "What's wrong with me?" and "Why did I do that?"[20]  A few days later, ITSN S.K. again told IT3 D.F. that she had sex with the appellant and thought he was cute.

ITSN S.K. did not report she had been assaulted until 26 January 2013.

**IT2 B.S.**

IT2 B.S. reported to USS MOUNT WHITNEY in early January 2013 and was assigned to the radio division in the communications department.  The appellant was her work center supervisor.  She also worked with and befriended ITSN S.K.  IT2 B.S. was engaged to another Sailor stationed in Norfolk, Virginia.

On 25 January 2013, IT2 B.S. went out in town with some shipmates.  After stopping at the apartment of a friend, IT2 S.B., the group went to "The Dutch" for dinner.  There, IT2 B.S. ate dinner and consumed two "shooters," which she described as "two or three more sizes than a shot."[21]  The group next moved to a bar which was a long walk from "The Dutch," where IT2 B.S. consumed one Red Bull and vodka.  They then went to another pub where IT2 B.S. consumed another Red Bull and vodka.  Next, IT2 B.S. and IT2 S.B. returned to IT2 S.B.'s apartment to change clothes before they rejoined their friends and then walked to "Anna's."  IT2 B.S. stated that when she arrived at "Anna's" she felt "tipsy."[22]  She does not remember if she drank any more alcohol while she was there, but did recall seeing the appellant there and conversing with him.

IT2 S.B. testified that while IT2 B.S. was at "Anna's" she was "feeling pretty good,"[23] but wasn't slurring her words or stumbling.  He did not believe she was drunk and when she left the bar, she was fine and was not falling or stumbling.  At that point, IT2 S.B. left the group and went home.  A different witness out that night reported seeing IT2 B.S. with her arm interlocked with the appellant while at "Anna's."

---

[20]  *Id.* at 1024–25.

[21]  *Id.* at 581.

[22]  *Id.* at 475.

[23]  *Id.* at 976.

6

Next, IT2 B.S. and her shipmates went to "Monique's." The appellant did not go to "Monique's," so he and IT2 B.S. parted ways. IT2 B.S. remembered having at least one shot and one drink at "Monique's." She reported being very drunk and starting to experience memory loss. She recalled dancing with another shipmate outside of "Monique's," and then leaning against the wall and smoking a cigarette.

IT3 H.W. testified she saw IT2 B.S. outside of "Monique's" trying to light a cigarette backwards "and that's when I noticed that she was kind of drunk."[24] IT3 H.W. brought IT2 B.S. a bottle of water, which she drank. Asked what IT2 B.S.'s demeanor was like at that point, IT3 H.W. responded, "I mean she seemed a little drunk, but overall she seemed fine, functional."[25]

While IT2 B.S. and IT3 H.W. were outside of "Monique's," CWO3 G.B., again acting as shore patrol, arrived at the bar and witnessed IT2 B.S. leaning up against the wall drinking a bottle of water. While inside dealing with an unrelated matter, another Sailor told him that IT2 B.S. "had been drinking pretty heavily."[26] After finishing with the other matter, CWO3 G.B. told IT2 B.S. that she needed to return to the ship and directed IT3 H.W. to accompany her back. He reported that IT2 B.S. was able to speak with him, walk on her own, and was not stumbling.

The other member of shore patrol that evening also saw IT2 B.S. leaning against the wall and was present when CWO3 G.B. ordered her back to the ship. He described her as compliant and quiet and testified that "[w]hen she walked away, I didn't see any stagger in the walk or anything of that nature. She may --- and so I'm not exactly sure what her level of drunkenness was."[27]

As IT3 H.W. was walking IT2 B.S. back to the ship, they encountered the appellant. IT3 H.W. wanted to return to the bar with her friends, so the appellant volunteered to accompany IT2 B.S. back to the ship. No other witnesses observed IT2 B.S. for the rest of the evening.

---

[24] *Id.* at 660-61.

[25] *Id.* at 662-63.

[26] *Id.* at 915.

[27] *Id.* at 573.

7

IT2 B.S. recalled that while walking back to the ship with the appellant, she told him she wanted to stay out and party.[28] She recalled having her arm interlocked with the appellant's and recognizing a café they walked past. She only remembered fragments of the evening thereafter.

The next thing IT2 B.S. recalled is the appellant engaging in anal sex with her. She felt pain and told him to stop, which he did. B.S. then became sick, vomiting on the bed, and got up to clean herself off and go to the bathroom. As she did this, she recognized the apartment she was in as one she had visited prior to that evening. She went to the bathroom and turned on the shower to rinse herself off. Her next memory was being on the floor of the bathroom naked with the appellant banging on the hatch. She recalled feeling very cold and sick and returned to the bed to get under the covers. She recalled that at some point she got out of bed and went to the kitchen to get water.

IT2 B.S. reported various fragmented memories following the shower. She remembered engaging in vaginal sexual intercourse and sexual conduct in various positions, including being on top of the appellant, lying on her side, and being on her hands and knees with the appellant entering her from behind. She reported at one point while she was on top, the appellant bit her nipple. This caused her pain, so she told him to stop, which he did. She also recalled performing fellatio on the appellant while he lay on his back.

IT2 B.S. admitted she enjoyed certain portions of the sex, stating, "I recall telling [the Naval Criminal Investigative Service] about the doggie style and it was vaginal and I --- I do recall telling them that I enjoyed it and that I --- I did for the moment that I --- I woke up or, you know, had the next memory I did enjoy it for that."[29] After being asked, "Does that mean it felt good?" she responded, "That night, yes, for those moments, yes, after the next day, no."[30]

IT2 B.S. recalled the appellant directing her not to tell anyone what had happened, specifically mentioning ITSN S.K., and finally recalled falling asleep with the appellant "caressing

---

[28] *Id.* at 631.

[29] *Id.* at 650.

[30] *Id.*

her arm."[31]   She had no indication of the times that all these events happened.

The next morning, IT2 B.S. was awakened by another petty officer from the ship sent to retrieve her.  The appellant had already departed.  She got dressed, asked if "she had any hickies,"[32] and was concerned she was going to be in trouble for not returning to the ship the previous evening.

Upon returning to the ship, her chief petty officer and a lieutenant verbally counseled IT2 B.S. regarding her alcohol use and making a good impression on the ship as a newly reported Second Class Petty Officer.  Afterwards, IT2 B.S. showered and went to sleep.

IT2 B.S. was awakened in the afternoon by ITSN S.K., who had heard she had not returned to the ship the previous evening. Eventually, IT2 B.S. told ITSN S.K. about what had transpired between her and the appellant.  ITSN S.K. then relayed to IT2 B.S. what had happened between herself and the appellant the previous month.  They decided IT2 B.S. should report she had been assaulted.  After IT2 B.S. finished her report to a victim advocate, ITSN S.K., on IT2 B.S.'s urging, reported her alleged assault as well.

**Expert Testimony**

Each party sponsored an expert witness to discuss levels of intoxication and the effects of alcohol.  Dr. Bruins, a forensic toxicologist from the Air Force Drug Testing Laboratory, testified for the Government in broad terms about how the human body processes alcohol, the meaning of blood alcohol content (BAC), and, using what is known as the Dubowski chart, the stages of alcohol influence given ranges of BAC.  Dr. Bruins did not, however, feel comfortable calculating a BAC for either complainant.  Regarding ITSN S.K., he stated "there was just very little information on the type -- you have to know the type of alcohol, whether it's beer, wine or distilled spirits because they vary in alcohol content.  You have to know the individual's body weight.  You have to know their drinking history and more importantly, you have to know a timeline and so with the

---

[31]   *Id.* at 649-50.

[32]   *Id.* at 603.

situation with [ITSN S.K.], I – that information was not available."[33]

Regarding IT2 B.S., Dr. Bruins testified "there was information available, there was the ability to piece part of this together, but there were several missing gaps."[34]  These gaps again included type and amount of alcohol and timeline.

Dr. Bruins testified that BAC levels continue to rise for 30 to 60 minutes after the last drink is consumed.  He also discussed the distinction between blackout——memory loss——versus pass out——unconsciousness.  The higher a person's BAC, the more likely he will experience blackout.  A person experiencing blackout could, however, still be functioning and responsive to others; their brain just is not recording memories.  Prompted by the trial counsel, Dr. Bruins opined that "an ordinary, normal person can observe these effects and have the suggestion or opinion that something is going on with that individual and that they may be under the influence of something."[35]

The defense called Dr. Fromme, a professor of clinical psychology at the University of Texas, Austin.  Dr. Fromme conducts research and teaches classes on the effects of alcohol and possesses significant credentials in the area of alcohol research.  Her professional focus is "on alcohol use and the effects of alcohol intoxication with specific focus on alcohol related blackouts, the effects of alcohol intoxication on behavior such as sexual risk taking."[36]

Dr. Fromme testified that "[a]t higher doses of alcohol as people become progressively more intoxicated, they might begin to act in reckless, aggressive or even sexually provocative ways."[37]  Dr. Fromme explained another effect of alcohol that she referred to as "alcohol myopia" — a focus on immediate effects and disregard for long-term consequences.  Dr. Fromme also addressed alcohol-related blackout, stating that during blackout, an individual:

---

[33]  *Id.* at 735.

[34]  *Id.*

[35]  *Id.* at 748.

[36]  *Id.* at 1082.

[37]  *Id.* at 1085.

is still fully conscious.  They're moving around, acting, engaging, talking, dancing, driving, engaging in all kinds of behavior, but because of alcohol's inhibition of the transfer of information from short-term memory to long-term memory, they simply will be unable to remember those decisions or actions they made while in the blackout.[38]

Pass-out, on the other hand, typically occurs at BACs of 0.30 or higher and occurs when the level of alcohol reaches such a high level "that the part of the brain that controls consciousness has literally shut down, so those individuals have lost consciousness"[39] and would not easily be roused.

Dr. Fromme stated that a person in a black-out state can still be able to engage in voluntary behavior and thought processes.  "They might make decisions, for example, to drive home from a bar, or to climb onto the roof of a building, or to purchase an airline ticket online, all activities which require complex cognitive abilities, but the individual might not remember the next day and might, in fact, might regret it."[40]

**Analysis**

Under Article 66(c), UCMJ, we conduct a *de novo* review of factual sufficiency of each case before us.  *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002).  The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses," we are ourselves convinced of the accused's guilt beyond a reasonable doubt.  *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987).  "Such a review involves a fresh, impartial look at the evidence, giving no deference to the decision of the trial court on factual sufficiency beyond the admonition in Article 66(c), UCMJ, to take into account the fact that the trial court saw and heard the witnesses." *Washington*, 57 M.J. at 399.  Proof beyond a reasonable doubt does not mean, however, that the evidence must be free from conflict.  *United States v. Goode*, 54 M.J. 836, 841 (N.M.Ct.Crim.App. 2001).

---

[38] *Id.* at 1087.

[39] *Id.* at 1087-88.

[40] *Id.* at 1094.

Common elements for both sexual assault and abusive sexual contact as charged in this case are that the complainants were, at the time of the sexual conduct in question, incapable of consenting to the conduct due to impairment by an intoxicant and that the appellant knew or reasonably should have known this. MANUAL FOR COURTS-MARTIAL, UNITED STATES (2012 ed.), Part IV, ¶¶ 45b and 45d. After careful deliberation, and accounting for the fact that we did not personally observe the witnesses, we are not ourselves convinced that the Government proved these elements beyond a reasonable doubt.

Our conclusion has nothing to do with the sincerity or credibility of either complainant. It turns, instead, on the high burden the Government carries in a criminal case and an issue the record shows the members struggled with: how impaired does a person have to be before they are "incapable of consenting"?

The short answer is our interpretation of the law applied to our assessment of the facts in this case leaves us with reasonable doubt that the complainants were legally "incapable of consenting" as well as reasonable doubt that the appellant knew or reasonably should have known they were incapable of consenting.

There is a dearth of case law interpreting the phrase "incapable of consenting" and the breadth of the current Article 120. But, in a search for meaning, we need look no further than the words of the statute itself. *See United States v. Ron Pair Enters.*, 489 U.S. 235, 240-41 (1989) ("as long as the statutory scheme is coherent and consistent, there generally is no need for a court to inquire beyond the plain language of the statute").

After enumerating that it is a crime to commit sexual acts or contact upon a person incapable of consenting, Article 120 defines "consent" as "a freely given agreement to the conduct at issue by a competent person" and goes on to state that a "sleeping, unconscious, or incompetent person cannot consent." Art. 120(g)(8), UCMJ. Reading these provisions together, to prove a violation of Article 120(b) or (d), the Government must prove that a listed condition rendered the complainant incapable of entering a freely given agreement. Here, the terms "competent" and "incompetent" in the definitions section merely refer back to the punitive language regarding those incapable of consenting; it adds no further punitive exposure. Thus, in this context, a "competent" person is simply a person who possesses

12

the physical and mental ability to consent.  An "incompetent" person is a person who lacks either the mental or physical ability to consent due to a cause enumerated in the statute.  To be able to freely give an agreement, a person must first possess the cognitive ability to appreciate the nature of the conduct in question, then possess the mental and physical ability to make and to communicate a decision regarding that conduct to the other person.

Applying that interpretation to this case, we are not convinced beyond a reasonable doubt that the complainants were incapable of consenting——that is, that they lacked the cognitive ability to appreciate the sexual conduct in question or the physical or mental ability to make and to communicate a decision about whether they agreed to the conduct.  Additionally, even if we were to conclude that they were "incapable of consenting," we conclude that under the facts of this case, the Government did not prove beyond a reasonable doubt that the appellant knew or reasonably should have known of this condition.  We base this on the totality of the record under the unique circumstances of this case, but we address some of the specific issues that cause us doubt below.

As the Government's own expert highlighted, the complainants themselves were only able to provide limited insight into what, how much, and over what period of time they consumed alcohol.  There were no blood alcohol tests in evidence and witnesses who observed the complainants largely minimized their level of intoxication.  The Government was often forced to attempt to impeach their own witnesses——somewhat unpersuasively in our opinion——on supposedly contradictory statements they had made on this point.

Regarding ITSN S.K., two impartial witnesses observed her walk back to the ship with the appellant without any apparent difficulty, navigate the gate and ladder well, request permission to come aboard, and scan her identification card.  While she was intoxicated enough that CWO3 G.B. singled her out and ordered her back to the ship, this, standing alone, does not prove she was sufficiently impaired that she was incapable of consenting to sexual activity.  Further, ITSN S.K. herself conceded in cross-examination that she may have said "yes" to the sexual intercourse, and just could not remember doing so. We think this more than a mere speculative possibility here. Under these circumstances, her fragmentary memory of kissing the appellant and telling him he was cute, then of being propped up supporting her own weight on her elbows having sexual

13

intercourse with him does not persuade us beyond a reasonable doubt that somewhere in between, she had become manifestly unaware of what was happening or unable to make or to communicate decisions.

Similar concerns apply to IT2 B.S. She was able to recall making the decision to "stay out and party" despite being aware of shore patrol's order to return to the ship.[41] She conceded during cross-examination that she knew she had been ordered back, was able to formulate the thought that she wanted to stay out instead, and was able to decide and to communicate that she wanted to stay out. As with ITSN S.K., she had only fragmentary memory from there, but she remembered that when certain activities were painful or unpleasant, she was able to determine that she did not want that activity to continue and to articulate that to the appellant, who stopped. She further candidly related active participation in and even enjoying portions of the sexual activity.

In addition to not supporting the conclusion that ITSN S.W. and IT2 B.S. were "incapable of consenting," we view this as evidence supporting the conclusion that the appellant reasonably may have believed that they were willing partners in sexual activity. Under these and all circumstances in the record, we are not convinced beyond a reasonable doubt that the appellant knew or reasonably should have known that she was incapable of consenting.

## Conclusion

The findings of guilty to Charge I and its Specifications 1 through 3 and 5 are set aside and Charge I and its Specifications 1 through 3 and 5 are dismissed. The findings of guilty of Charge II and its specifications (fraternization) are affirmed. Because this represents "a 'dramatic change' in the penalty landscape" and we cannot reliably determine what sentence the members would have imposed for the remaining fraternization offenses, *United States v. Riley*, 58 M.J. 305, 312 (C.A.A.F. 2003), we also set aside the sentence. The record is returned to the Judge Advocate General of the Navy for remand

---

[41] *Id*. at 631.

14

to an appropriate convening authority with a rehearing on sentence authorized.  Art. 66(d), UCMJ.

Chief Judge MITCHELL and Judge HOLIFIELD concur.

For the Court




R.H. TROIDL
Clerk of Court

15