# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before
HAIGHT, PENLAND, and WOLFE
Appellate Military Judges

**UNITED STATES, Appellee**
**v.**
**Private First Class JARRID R. LOVETT**
**United States Army, Appellant**

ARMY 20140580

Headquarters, Fort Knox
Steven E. Walburn, Military Judge (arraignment and pretrial motions)
Gregory R. Bockin, Military Judge (pretrial motions and trial)
Colonel Christopher T. Fredrikson, Staff Judge Advocate (pretrial)
Colonel E. Edmund Bowen, Jr. Staff Judge Advocate (post-trial)

For Appellant:  Major Aaron R. Inkenbrandt, JA; Captain Heather L. Tregle, JA.

For Appellee:  Major A.G. Courie, III, JA.

29 April 2016

----------------------------------
MEMORANDUM OPINION
----------------------------------

*This opinion is issued as an unpublished opinion and, as such, does not serve as precedent.*

WOLFE, Judge:

A general court-martial composed of officer members convicted appellant, contrary to his pleas, of one specification of sexual assault, in violation of Article 120(b)(2), Uniform Code of Military Justice, 10 U.S.C. § 920(b)(2) [hereinafter UCMJ].  The panel sentenced appellant to a dishonorable discharge, confinement for four years, forfeiture of all pay and allowances, reduction to the grade of E-1, and hard labor without confinement for three months.  The convening authority disapproved the hard labor without confinement but otherwise approved the sentence as adjudged.  The automatic forfeitures were waived for a period of six months.  The adjudged forfeitures were deferred until action.  At action, the adjudged forfeitures

were suspended for forty-three days at which point, as they had not been earlier vacated, they were remitted.[1]

Appellant's case is now before this court for review pursuant to Article 66, UCMJ.  Appellant submitted this case on its merits.  However, we find two matters warrant detailed discussion, including matters raised by appellant pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982).[2]

---

[1] The combined effect of the deferment, suspension, and waiver of the adjudged and automatic forfeitures was that appellant's dependents received the otherwise forfeited pay for a period of six months.

[2] The *Grostefon* matters raised by appellant but not discussed in detail are as follows:

First, appellant claims that his due process and equal protection rights were violated with regards to the issue of "voluntary intoxication."  We agree with the military judge that when, as here, the sexual act does not involve a specific intent requirement, appellant's voluntary intoxication is not legally relevant to whether he committed the offense.  *See* Rule for Courts-Martial [hereinafter R.C.M.] 916(l)(2) ("evidence of any degree of voluntary intoxication may be introduced for the purpose of raising a reasonable doubt as to the existence of actual knowledge, specific intent, or premeditated design to kill . . . .")

Second, appellant argues the military judge erroneously denied his request for an expert consultant in forensic psychology.  We find the military judge's denial of the motion was within his discretion.

Third, appellant complains that the military judge impermissibly restricted appellant's general voir dire questions.  Neither party followed the military judge's pretrial order on the submission of general voir dire questions.  We find that the military judge did not abuse his discretion in limiting the general voir dire questions, and in any event, any error was harmless given the liberal individual voir dire of every panel member.

Fourth, appellant avers that the military judge improperly excluded the recording of a 911 call that summoned the police to the scene of the assault and subsequent altercation.  We do not find error in the military judge's ruling at the time he made it.  To the extent that the government's cross-examination of the witness opened the door to admitting the recording, appellant did not ask the military judge to revisit his ruling.  Even assuming error, we find no prejudice given that the 911 recording was

(continued...)

## I. BACKGROUND

Specialist (SPC) WL lived on Fort Knox, Kentucky.  Specialist WL was a platoon mate, battle buddy, friend, and neighbor of appellant.  Both of their wives were also friends.  Specialist WL was the primary witness for the government in testifying as to the charged offense and testified as follows:

On 30 May 2013, after the unit had been given time off to spend with family in anticipation of an upcoming deployment, SPC WL had a barbecue at his house. SPC WL and appellant together purchased beer and hard liquor for the get-together. SPC WL, appellant, both of their wives, as well as other neighbors attended the party.  During the course of the evening, SPC WL's wife, Mrs. SL, became grossly intoxicated after drinking beer and hard liquor on an empty stomach.

After Mrs. SL fell down outside and vomited in the yard, SPC WL assisted his wife to the house.  Inside the house, she continued to vomit in the bathroom, eventually emptying the contents of her stomach.  After she stopped throwing up for a minute, SPC WL decided he needed to get her into bed.  With her arm around him, he walked her towards the bedroom.  Once in the bedroom, Mrs. SL vomited bile and began to "dry-heave."  She then urinated on herself.  SPC WL removed his wife's shorts and underwear, attempted to clean her up, and placed her in her bed and covered her with blankets.  From the point they entered the bedroom, SPC WL

---

(…continued)

cumulative with the testimony of the neighbor who called 911 and testified for the defense as to what he saw and heard.

Fifth, appellant complains that the military judge improperly gave an instruction limiting the permissible uses of Sergeant (SGT) Arcovio's testimony.  The limiting instruction was crafted by both parties and appellant's counsel specifically agreed that the instruction was "an appropriate limiting instruction."  We find appellant waived the issue.

Sixth, appellant complains that he was served two different convening authority actions.  In our review of the post-trial matters, it appears that the staff judge advocate forwarded with the post-trial recommendation (SJAR) an unsigned draft version of the proposed convening authority action.  The SJAR and the draft action did not recommend or provide for clemency.  We find no error in providing appellant a copy of the proposed action. Providing the proposed action before he submitted clemency matters made transparent the potential effect of the SJAR's recommendation.  Even assuming error, appellant forfeited the issue by failing to object and he has not demonstrated the material prejudice of any substantial rights. *See* R.C.M. 1106(f)(6).

testified that he "was trying to talk to her. And she wasn't responding to anything." Appellant was with SPC WL the entire time he was assisting his wife.

Specialist WL then turned off the bedroom lights, left the door cracked open, and went outside to have a cigarette with appellant. As the party wound down, SPC WL told appellant that "[t]he party's pretty much over" and that appellant should help himself to whatever beer there was in the refrigerator to take home. Because he escorted another drunk guest home, SPC WL did not see appellant for about the next twenty minutes.

When SPC WL returned to his house, he found the bedroom door he had left ajar was now shut and locked. Unlocking and opening the door, SPC WL saw appellant on top of Mrs. SL having sex with her. Specialist WL yelled a vulgarity at appellant, who then rolled off of Mrs. SL and began buttoning his pants. Appellant attempted to explain to SPC WL that it wasn't what it looked like and that appellant had only been "dry humping" Mrs. SL. When asked if his wife appeared conscious at the time of the incident, SPC WL testified that "she didn't seem like she knew what was going on."

Appellant and SPC WL then began a verbal and physical fight that started in the bedroom and continued outside. Specialist WL testified that appellant continued to try to tell him that what he had seen was something other than what it appeared and asked SPC WL not to involve the military police. While outside, the two continued to shout expletives at each other. The altercation ended when the military police, summoned by a neighbor, arrived just as appellant was putting a hacksaw blade to his neck and threatening to kill himself.

Mrs. SL testified that she had only a hazy recollection of the evening. She remembers hearing her husband yelling in the room and hearing the fighting, but without opening her eyes or trying to get up. She stated that she had no memory of having sex with appellant but did remember having some vaginal pain the next day. On cross examination, Mrs. SL testified that she told someone, but could not remember as to whom, that she had thought she was having sex with her husband.

In addition to the testimony of SPC WL and Mrs. SL, the government called neighbors (to include appellant's wife) and first responders to testify to their observations about how much alcohol Mrs. SL consumed, how drunk she appeared, and some of her statements made to medical personnel. The government also called a toxicologist and a DNA examiner. The DNA examiner testified that swabs taken from appellant's genitals had DNA consistent with that of Mrs. SL. Finally, the government called a law enforcement agent who testified that appellant presented evolving stories about the night in question as he was confronted with evidence before ultimately admitting that Mrs. SL was not an active participant in the sexual intercourse.

In defense, appellant presented witness and expert evidence that Mrs. SL was not as drunk as the government witnesses claimed. Additionally, the defense called Sergeant (SGT) Arcovio, the neighbor who dialed 911. Sergeant Arcovio testified that he called 911 after hearing the following exchange:

> Person 1: "I'm going to kill you,"
>
> Person 2: "I don't know . . . what you're talking about"
>
> Person 1: "I walked in on you. You were butt naked on top of my wife. I'm gonna f**king kill you, and I'm gonna f**king kill her."

Although SGT Arcovio could not identify the speakers, it was clear that SGT Arcovio was describing the altercation between SPC WL and appellant. The defense argued that SPC WL's threat to kill his spouse created a motive for her to fabricate her claims of incapacity in order to avoid her husband's anger.

## II. DISCUSSION

### A. *Defense Request That the Military Judge Define "Incapable of Consenting."*

During an Article 39(a), UCMJ, session, the military judge discussed instructions with both parties. The defense complained that the instructions contained "insufficient guidance from the court concerning impairment." The defense asked the military judge to provide additional instructions on "what impairment means" and "under what circumstances a drunk person can consent." The defense did not propose any specific instruction.[3] The government opposed any deviation from the instructions contained in the Military Judges' Benchbook. *See* Dep't of Army, Pam. 27-9, Legal Services: Military Judges' Benchbook [hereinafter Benchbook], para. 3-45-14 (1 Jan. 2010). The military judge noted the defense's

---

[3] Separately, the defense did propose an alternate instruction regarding the element that appellant "knew, or reasonably should have known" that the victim was incapable of consenting. The defense claimed that this imposed an unconstitutionally low *mens rea* standard of negligence on appellant and proposed that the military judge instruct the panel that a "reckless" or "culpably negligent" standard be used instead. The military judge rejected the defense's proposed instruction. The defense's motion aptly foreshadowed much of the thinking and logic of the Supreme Court's subsequent decision in *Elonis v. United States*, 135 S. Ct. 2001 (2015). However, the Court's decision in *Elonis* was clear that the holding of that case was limited to cases where the statute was silent on *mens rea*. *Id*. at 2010.

objection but did not provide additional instruction beyond what was provided in the Benchbook.

On appeal, appellant claims that the military judge erred to his prejudice by failing to define the terms "incapable" and "impairment." As appellant objected at trial, the issue is preserved on appeal. Nonetheless, we find the military judge did not err in declining to further instruct the panel on when exactly a victim is incapable of consenting.

A military judge has a *sua sponte* duty to instruct on the elements. R.C.M. 920(e)(1). While a military judge "has wide discretion" as to the "form" of the instruction, *United States v. Behenna*, 71 M.J. 228, 232 (C.A.A.F. 2012), whether an instruction is a correct statement of the law is reviewed de novo. *United States v. Ivey*, 53 M.J. 685, 699 (Army Ct. Crim. App. 2000) *aff'd on other grounds*, 55 M.J. 251, 257 (C.A.A.F. 2001).

Recently, in *United States v. Pease* 75 M.J. 180, 2016 CCA LEXIS 235 (C.A.A.F. 17 Mar. 2016), our superior court addressed a similar issue. In *Pease*, it was the panel members (not, as here, the defense) who requested that the military judge provide additional instruction on what is meant by the words "competent person," as included in the military judge's explanation of the term "consent." 75 M.J. at __, 2016 CCA LEXIS 235, at *6. On intermediate appeal, the Navy-Marine Corps Court of Criminal Appeals (NMCCA) defined what was meant by "incapable of consenting" and, in applying that definition, found the evidence factually insufficient. As offered by the NMCCA, and as subsequently affirmed by the United States Court of Appeals for the Armed Forces (CAAF), "incapable of consenting" was defined as "lack[ing] the cognitive ability to appreciate the sexual conduct in question or [lacking] the physical or mental ability to make [or] to communicate a decision about whether they agreed to the conduct."[4] *Pease*, 75 M.J. at __, 2016 CCA LEXIS 235, at *13 (C.A.A.F. 17 Mar. 2016) (alteration in original) (quoting *United States v. Pease*, 74 M.J. 763, 770 (N.M. Ct. Crim. App. 2015)).

As an initial matter, *Pease* provides clearer guidance on the applicable legal definitions that we should employ when conducting our factual sufficiency review in this case. However, we must still address appellant's question of whether the military judge erred by not further defining the term for the panel. We determine he did not.

First, we note that, in *Pease*, neither the NMCCA nor the CAAF found the military judge erred in failing to define "incapable of consenting." *Pease*, 75 M.J. at

---

[4] So defined, the definition shares a similarity with the defense of lack of mental responsibility. *See* R.C.M. 916(k)(1) (the defense includes that the accused was "unable to *appreciate* the nature and quality . . . of his acts") (emphasis added).

6

__, 2016 CCA LEXIS 235; *Pease*, 74 M.J. 763. Notably, *Pease* involved a case where the panel members specifically requested such guidance.

Second, we do not interpret *Pease* as *requiring* the military judge to provide additional instruction on the definition of "incapable of consenting." As the CAAF's decision in *Pease* makes clear, the definitions used by CAAF and the NMCCA are based on "the ordinary meaning of the language, [and] the context in which it is used . . . ." 75 M.J. at __, 2016 CCA LEXIS 235, at *15. That is, the definitions used in *Pease* are those used in every-day English. Whether "incapable of consenting" should be further explained to the panel will likely depend on the degree to which the evidence puts the matter at issue, whether the panel requests additional guidance, and is ultimately within the sound discretion of the military judge.

Finally, we note in our reading of *Pease*, the CAAF appears to leave the door open for additional development in case law. The court appeared to allow for a broader definition in some circumstances. Considering whether the NMCCA's definition of a "freely given agreement" was overly limiting, the CAAF stated:

> the CCA's definition of that phrase may be viewed as not accounting for those situations where a victim has the *ability* to appreciate the conduct, and the mental and physical *ability* to communicate the decision, *but does not articulate* non-consent out of fear or due to some other external compulsion counteracting voluntariness.

*Id.* at *13 (emphasis in original). The CAAF concluded that "any imprecision" in the NMCCA's definition did not amount to reversible error. *Id.* Accordingly, we do not interpret *Pease* as a mandate. There is a substantial chasm between finding the absence of reversible error and creating an affirmative instructional obligation.

Accordingly, we do not find the military judge abused his discretion by not further defining the term "incapable of consenting."

### *B. Did the Military Judge Err in Excluding Evidence Under Military Rule of Evidence 412 of a Prior Affair by Mrs. SL*

Prior to trial, the defense moved under Military Rule of Evidence [hereinafter Mil. R. Evid.] 412(b)(2)(C) and based upon *United States v. Ellerbrock.* 70 M.J. 314 (C.A.A.F. 2011), to admit a prior affair by Mrs. SL. In a closed hearing Mrs. SL testified that the prior affair occurred three-to-four years earlier while she and her husband were separated. She further testified that she voluntarily disclosed the affair without incident as part of their subsequent reconciliation.

We review the military judge's ruling on whether to exclude evidence pursuant to Mil. R. Evid. 412 for an abuse of discretion. *United States v. Roberts*, 69 M.J. 23, 26 (C.A.A.F. 2010).

As this case raises the same issues as in *Ellerbrock,* we cite our superior court's explanation of the law in that case at length.

> M.R.E. 412 states that evidence offered by the accused to prove the alleged victim's sexual predispositions, or that she engaged in other sexual behavior, is inadmissible except in limited contexts. M.R.E. 412(a)–(b). The rule "is intended to 'shield victims of sexual assaults from the often embarrassing and degrading cross-examination and evidence presentations common to [sexual offense prosecutions].'" *United States v. Gaddis,* 70 M.J. 248, 252 (C.A.A.F. 2011) (alteration in original) (quoting *Manual for Courts–Martial, United States,* Analysis of the Military Rules of Evidence app. 22 at A22–35 (2008 ed.)). While there are three exceptions set out in the rule, we are concerned only with the third, which states that the evidence is admissible if "the exclusion of . . . [it] would violate the constitutional rights of the accused." M.R.E. 412(b)(1)(C).

> The exception for constitutionally required evidence in M.R.E. 412(b)(1)(C) includes the accused's Sixth Amendment right to confrontation. *Banker,* 60 M.J. at 216, 221 (citing *Weinstein's Federal Evidence* § 412.03[4][a] (2d ed. 2003)). An accused has a constitutional right "to be confronted by the witnesses against him." U.S. Const. amend. VI. That right necessarily includes the right to cross-examine those witnesses. *Davis v. Alaska,* 415 U.S. 308, 315, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974) (citing *Douglas v. Alabama,* 380 U.S. 415, 418, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965)). In particular, the right to cross-examination has traditionally included the right "'to impeach, *i.e.,* discredit the witness.'" *Olden v. Kentucky,* 488 U.S. 227, 231, 109 S.Ct. 480, 102 L.Ed.2d 513 (1988) (quoting *Davis,* 415 U.S. at 316, 94 S.Ct. 1105).

> However, an accused is not simply allowed "'cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.'" *Delaware v. Van Arsdall,* 475 U.S. 673, 679, 106 S.Ct. 1431, 89

L.Ed.2d 674 (1986) (quoting *Delaware v. Fensterer,* 474 U.S. 15, 20, 106 S.Ct. 292, 88 L.Ed.2d 15 (1985) (per curiam)). Indeed, "'trial judges retain wide latitude' to limit reasonably a criminal defendant's right to cross-examine a witness 'based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.'" *Michigan v. Lucas,* 500 U.S. 145, 149, 111 S.Ct. 1743, 114 L.Ed.2d 205 (1991) (quoting *Van Arsdall,* 475 U.S. at 679, 106 S.Ct. 1431). But no evidentiary rule can deny an accused of a fair trial or all opportunities for effective cross-examination. *See Van Arsdall,* 475 U.S. at 679, 106 S.Ct. 1431.

Generally, evidence must be admitted within the ambit of M.R.E. 412(b)(1)(C) when the evidence is relevant, material, and the probative value of the evidence outweighs the dangers of unfair prejudice. *See Gaddis,* 70 M.J. at 255 ("[T]he best reading of the rule is that, as in its prior iteration, the probative value of the evidence must be balanced against and outweigh the ordinary countervailing interests reviewed in making a determination as to whether evidence is constitutionally required."). Relevant evidence is any evidence that has "any tendency to make the existence of any fact . . . more probable or less probable than it would be without the evidence." M.R.E. 401. The evidence must also be material, which is a multi-factored test looking at "'the importance of the issue for which the evidence was offered in relation to the other issues in this case; the extent to which the issue is in dispute; and the nature of the other evidence in the case pertaining to th[at] issue.'" *Banker,* 60 M.J. at 222 (quoting *United States v. Colon–Angueira,* 16 M.J. 20, 26 (C.M.A. 1983)). Finally, if evidence is material and relevant, then it must be admitted when the accused can show that the evidence is more probative than the dangers of unfair prejudice. *See* M.R.E. 412(c)(3). Those dangers include concerns about "harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Van Arsdall,* 475 U.S. at 679, 106 S.Ct. 1431.

*United States v. Ellerbrock*, 70 M.J. 314, 317-19 (C.A.A.F. 2011).

We find that the military judge properly found this case distinguishable from *Ellerbrock*. The facts in *Ellerbrock* regarding the prior affair involved a "hot tempered" husband who kicked in the door of his wife's paramour. *Id.* at 317. Omitting the prior affair in *Ellerbrock* deprived the court-martial from learning that the victim would likely fear a similarly violent reaction from her husband if there was a second transgression. That is, her husband's violent reaction (and hot temper) could create a reasonable inference that she lied to cover up a second instance of adultery. Prohibiting the defense from exploring the victim's motive to fabricate during cross-examination unconstitutionally limited Private First Class Ellerbrock from confronting the witnesses against him. *Id.* at 320.

Here, on the other hand, the prior affair did not result in threats or violence. By all accounts, the prior affair was resolved without confrontation or disharmony. To be sure, there was ample evidence that SPC WL responded violently and aggressively when he found appellant on top of his wife. Unlike *Ellerbrock*, however, that evidence *was* presented to the fact finder as part of the *res gestae* of the offense. Appellant was not prohibited from asking the panel to infer that SPC WL's violent response was a basis for Mrs. SL to fabricate her claims of incapacity.

In *Ellerbrock* the CAAF stated that "[i]t is a fair inference that a second consensual sexual event outside a marriage would be more damaging to a marriage than would a single event . . . ." *Id.* at 319. However, that "fair inference" was based on "assuming the evidence in the record supported that inference." *Id.* The supporting evidence the CAAF then cited was the husband's "hot temper[]" and violent response to the previous affair; exactly the evidence that is not present here with regards to the *prior* affair.

In short, we do not read *Ellerbrock* as requiring the per se admissibility of extra-marital affairs as a matter of course. Whether such evidence is admissible under Mil. R. Evid. 412(b)(2)(C) will depend on how strongly the prior affair supports a reasonable inference that the alleged victim is fabricating the allegation of assault. For example, an "open marriage" in which sex outside the marriage is routine, is less likely to support such an inference than the facts presented in *Ellerbrock*. In other words, a military judge must weigh the probative value of the Mil. R. Evid. 412 evidence against the danger of unfair prejudice, confusion of the issues, misleading the members, undue delay, waste of time, or cumulative evidence. *United States v. Gaddis*, 70 M.J. 248, 256 (C.A.A.F. 2011); Mil. R. Evid. 403.

Accordingly, we find no error in the military judge excluding evidence of Mrs. SL's prior affair.

## III. CONCLUSION

The findings and sentence are AFFIRMED.

Senior Judge HAIGHT and Judge PENLAND concur.

FOR THE COURT:

JOHN P. TAITT
Chief Deputy Clerk of Court