# UNITED STATES NAVY–MARINE CORPS COURT OF CRIMINAL APPEALS

———————————————

No. 201600315

———————————————

## UNITED STATES OF AMERICA
Appellee

v.

## JAMIE R. BANNISTER
Information Systems Technician First Class (E-6), U.S. Navy
Appellant

———————————————

Appeal from the United States Navy-Marine Corps Trial Judiciary

Military Judge: Commander Arthur L. Gaston III, JAGC, USN.
Convening Authority: Commander, Navy Region Hawaii, Pearl
Harbor, HI.
Staff Judge Advocate's Recommendation: Commander Monica V.
Mallory, JAGC, USN.
For Appellant: Lieutenant Commander Jeremy J. Wall, JAGC, USN.
For Appellee: Major Cory A. Carver, USMC; Lieutenant Megan P.
Marinos, JAGC, USN.

———————————————

Decided 31 May 2017

———————————————

Before CAMPBELL, FULTON, and HUTCHISON, *Appellate Military Judges*

———————————————

**This opinion does not serve as binding precedent, but may be cited as persuasive authority under NMCCA Rule of Practice and Procedure 18.2.**

———————————————

HUTCHISON, Judge:

A general court-martial composed of officer members convicted the appellant, contrary to his pleas, of one specification of sexual assault and two specifications of abusive sexual contact in violation of Article 120, Uniform

Code of Military Justice (UCMJ), 10 U.S.C. § 920 (2012).[1] The convening authority (CA) approved the adjudged sentence of reduction to paygrade E-1 and a dishonorable discharge.

In his sole assignment of error, the appellant asserts that his convictions are legally and factually insufficient since the government failed to prove that the victim was incapable of consenting to sex due to intoxication and that the appellant did not have a reasonable mistake of fact as to consent. We disagree and find the appellant's convictions legally and factually sufficient but conclude that, although not raised by the parties, the two abusive sexual contact specifications represent an unreasonable multiplication of charges. Consequently, after careful consideration of the record of trial and the parties' pleadings, we set aside the appellant's conviction of Specification 2 of Charge I and dismiss that offense with prejudice. We conclude that the remaining findings and sentence are correct in law and fact and that no error materially prejudicial to the substantial rights of the appellant remains. Arts. 59(a) and 66(c), UCMJ.

## I. BACKGROUND

In September 2014, the appellant travelled to Virginia Beach, Virginia, to attend the wedding of MD and TD. The appellant was the best man at the wedding, and he first met the maid of honor, JCH, a few days before the ceremony. The appellant and JCH had little interaction until the wedding reception and after-party at the wedding-venue hotel's pool. There the appellant and JCH flirted with each other, played games, splashed and chased each other.

After the pool closed, the appellant, JCH, and another groomsman, JS, went to a nearby dance club. The group drank shots of alcohol and JCH and the appellant danced "really closely," "grinding."[2] When that club closed, they went to an after-hours nightclub in Norfolk, Virginia. JCH drank part of a wine cooler there, and once again, she danced closely with the appellant. JCH testified that she and the appellant found a secluded area on the dance floor and "made out a lot . . . our bodies were facing each other where we could talk and make out some more, kiss."[3]

After leaving the Norfolk club, the appellant and JS drove JCH to her house. Then, she drove to TD's house while the appellant and JS followed

---

[1] The members acquitted the appellant of forcible sodomy and one specification of attempted sexual assault.

[2] Record at 486.

[3] *Id.* at 487.

her.[4] Once back at TD's house, the appellant, JS, and JCH unloaded wedding gifts from JCH's car and watched a movie. JCH sat next to the appellant on a loveseat until he got up and went into a bedroom. JCH followed him, and the appellant and JCH "started making out . . . again."[5] JCH testified that she told the appellant that they were not going to have sex but conceded that she straddled him and kissed his chest and abdomen while he kissed her bare breasts. JCH testified that this entire encounter was consensual. As the sun began to rise, JCH left and drove home.

After sleeping only three to four hours, JCH returned to TD's home to watch TD and MD open wedding gifts. While there, she and the appellant talked about the previous night. Although she again kissed the appellant, she testified that she told him she just wanted to be friends. That evening, JCH met the appellant and JS to play bingo before returning with them to the Virginia Beach hotel, where the wedding took place, so they could go out for the night with MD, TD, and other members of the wedding party. JCH had two cups of champagne at the hotel and then the group took a shuttle to a Virginia Beach bar. JCH testified that the appellant bought the group shots and she remembered drinking four—but recognized that it "could have been more[.]"[6] JCH further testified that she had not eaten since the wedding reception the day before. TD testified that the appellant "came up with the idea that [the group] would have shots every 15 minutes" and that JCH had six shots and two mixed drinks.[7]

After approximately two hours at the bar, the group returned to the hotel. While saying goodbye to other members of the group in the hotel parking garage, TD noticed that JCH was "being really loud, obnoxious, picking up a huge orange cone and talking to it and throwing it[.]"[8] JCH found an unlocked car, got in it and then placed the orange cone on top of the car. TD testified that the appellant and JS were trying to calm JCH down, and TD was worried the police were going to be called. The appellant, JS, TD, and MD helped JCH up to TD's and MD's hotel room, where TD gave JCH some "breakfast bread" because she knew JCH "hadn't eaten anything all day."[9] TD then described JCH falling backwards onto the floor of the hotel room,

---

[4] According to JCH's testimony, she originally planned to return to her home, but realized that neither the appellant nor JS knew how to get back to TD's house in Virginia Beach, where they were staying.

[5] Record at 489.

[6] *Id*. at 500.

[7] *Id*. at 664-66.

[8] *Id*. at 668.

[9] *Id*. at 669.

hitting her head. JCH started laughing after she fell and remained lying on the floor as the rest of the group were deciding what to do with her, since she was unable to drive home. TD testified that she initially thought about letting JCH sleep on the pull-out couch in her hotel room, but the appellant and JS "said that they could take her back to their hotel and let her sleep[.]"[10] The appellant and JS picked up JCH off the floor and helped carry her out.

After leaving TD's hotel room, the appellant and JS took JCH back to their nearby hotel. JCH testified that her memory was foggy, but she recalled undressing herself, showering and then falling after the appellant helped her to the bathroom. Her next memory was of the appellant asking if she wanted to have sex, but being unable to answer him coherently. TD then described going in and out of consciousness while the appellant attempted or performed various sexual acts upon her. Specifically, she testified to the appellant digitally penetrating her vagina, placing his penis in her mouth, and attempting to put his penis in her anus while she was lying on the bathroom floor. Then the appellant attempted to penetrate her vagina with his penis while she was lying on the bed. She testified that she never consented to any of the activity and felt "helpless," like she "couldn't do anything."[11]

The following day, the appellant sent a series of text messages to JCH. At first he denied that anything occurred between them, stating:

> Sweetie [I] know you didn't [sic] remember much but [I] took care of you more than most [people] would[']ve. I stuck my own fingers down your throat to get [you] to throw up about 5 to 6 times. You were falling and hitting your head and falling into me . . . trust me [I] KNEW you were hammered and that means NO[. I] know the rules and [I] know [I] have ALOT [sic] LOT LOT to lose.[12]

After JCH told the appellant that she was going to the hospital to make sure she was ok, the appellant begged her not to. He admitted, "my penis was down near you touching you and [I] fingered you alot [sic] so [I] have no doubt there are traces of my [sic] on you and around your area[.]"[13] The appellant expressed concern that he would "go to jail[,] lose [his] family or [his] job over this[.]"[14] He wrote that if his command found out he would lose his "career[,]

---

[10] *Id.* at 669-70.

[11] *Id.* at 514.

[12] Prosecution Exhibit (PE) 5 at 2.

[13] *Id.* at 6.

[14] *Id.*

freedom and family[.]"[15] Finally, the appellant texted JCH, "[p]lease forgive me and please don[']t give them my name[. I] am at your mercy and begging for you not to give them my name. I am so sorry[. P]lease talk to me[.]"[16]

## II. DISCUSSION

### A. Unreasonable multiplication of charges

The appellant was charged with attempted sexual assault under Article 80, UCMJ, and with abusive sexual contact under Article 120, UCMJ. The members convicted the appellant of abusive sexual contact as both a lesser-included-offense (LIO) of the Article 80, UCMJ, attempted sexual assault and, separately, under the Article 120, UCMJ, specification.[17] Both specifications alleged the appellant touched JCH's vulva with his penis while she was incapable of consenting due to her impairment by alcohol. During their deliberations, the members specifically asked whether the two specifications were the same, and the military judge instructed them that they were.[18] After the announcement of findings, the military judge merged the specifications for sentencing.

"What is substantially one transaction should not be made the basis for an unreasonable multiplication of charges against one person." RULE FOR COURTS-MARTIAL 307(c)(4), MANUAL FOR COURTS-MARTIAL, UNITED STATES (2012 ed.). We review five nonexclusive factors from *United States v. Quiroz*, 55 M.J. 334, 338-39 (C.A.A.F. 2001) to determine whether there is an unreasonable multiplication of charges: (1) whether the accused objected at trial; (2) whether each charge and specification is aimed at distinctly separate criminal acts; (3) whether the number of charges and specifications

---

[15] *Id*. at 13.

[16] *Id*. at 14.

[17] Although we have doubts regarding whether abusive sexual contact is, in fact, a lesser-included-offense of attempted sexual assault, given the requirement to prove specific intent for *sexual contact*, we need not resolve the issue since we conclude that the specifications represent an unreasonable multiplication of charges. *See United States v. Marbury*, No. 20140023, 2016 CCA LEXIS 696, at *4, unpublished op. (A. Ct. Crim. App. 29 Nov 2016) (holding that abusive sexual contact is not a lesser included offense of sexual assault because the "elements of abusive sexual contact include specific intent, which is not an element of the penetrative sexual assault as charged").

[18] The members asked: "Is Spec[ification] #2 of Charge #2 the same as the lesser included offense of Charge I? The findings worksheet and descriptions in charges suggest to us they are. Please explain." Appellate Exhibit LV. The MJ responded: "Well, the short answer to that question is, yes, they're the same." Record at 939.

misrepresent or exaggerate the appellant's criminality; (4) whether the number of charges and specifications unreasonably increase the appellant's punitive exposure; and, (5) whether there is any evidence of prosecutorial overreaching or abuse in the drafting of the charges. These non-exclusive factors are weighed together, and "one or more factors may be sufficiently compelling[.]" *United States v. Campbell*, 71 M.J. 19, 23 (C.A.A.F. 2012).

Applying the *Quiroz* factors, we easily conclude that the appellant was convicted of two offenses for what amounts to a single criminal act. This unnecessarily exaggerates his criminality and unreasonably increases his punitive exposure. Thus, we find an unreasonable multiplication of charges.

"Within the context of unreasonable multiplication of charges, the military judge generally has wide discretion to dismiss offenses, merge offenses, or merge offenses only for purposes of sentencing." *United States v. Thomas*, 74 M.J. 563, 568 (N-M. Ct. Crim. App. 2014). However, when the members return findings of guilt to two specifications based upon a single criminal act, the military judge must either consolidate the specifications or dismiss one of them—not simply merge them for sentencing purposes. *See id.* (citing *United States v. Elespuru*, 73 M.J. 326, 329-30 (C.A.A.F. 2014)). Consequently, the military judge erred in not consolidating or dismissing one of these specifications. Therefore, we set aside the appellant's conviction for the abusive sexual contact LIO to Specification 2, Charge I, and dismiss it in our decretal paragraph.

## B. Legal and factual sufficiency

The appellant contends the government failed to prove (1) that JCH was incapable of consenting to sex with him due to her impairment by alcohol, and (2) that he did not have a reasonable mistake of fact as to consent.

As a threshold matter, we note a conviction for either sexual assault or abusive sexual contact required the government to prove that the appellant committed the sexual act or contact upon JCH while she was "incapable of consenting . . . due to [an] impairment by . . . [an] intoxicant . . . and that condition [was] known or reasonably should [have been] known" by the appellant.[19] In other words, Article 120(b)(3) already requires the government to disprove a mistake of fact defense, so "a mistake of fact defense is 'baked in' to the elements of the offenses themselves." *United States v. Teague*, 75 M.J. 636, 638 (A. Ct. Crim. App. 2016), *rev. denied*, 75 M.J. 373 (C.A.A.F. 2016). In short, if the government proved the appellant knew or reasonably should have known JCH was incapable of consenting to the sexual act or sexual contact—required for both the sexual assault and abusive sexual

---

[19] Article 120(b)(3) and (d), UCMJ.

contact offenses—then the government also, necessarily, proved that any *belief* by the appellant that JCH consented was unreasonable.

Turning now to the dispositive issue for the assigned error, we review questions of legal and factual sufficiency *de novo.* Art. 66(c), UCMJ; *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002). The test for legal sufficiency is "whether, considering the evidence in the light most favorable to the prosecution, any reasonable fact-finder could have found all the essential elements beyond a reasonable doubt." *United States v. Day*, 66 M.J. 172, 173-74 (C.A.A.F. 2008) (citing *United States v. Turner*, 25 M.J. 324, 324 (C.M.A. 1987)). In applying this test, "we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted).

The test for factual sufficiency is whether "after weighing all the evidence in the record of trial and recognizing that we did not see or hear the witnesses as did the trial court, this court is convinced of the appellant's guilt beyond a reasonable doubt." *United States v. Rankin*, 63 M.J. 552, 557 (N-M. Ct. Crim. App. 2006) (citing *Turner*, 25 M.J. at 325 and Art. 66(c), UCMJ), *aff'd on other grounds*, 64 M.J. 348 (C.A.A.F. 2007). In conducting this unique appellate role, we take "a fresh, impartial look at the evidence," applying "neither a presumption of innocence nor a presumption of guilt" to "make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt." *Washington*, 57 M.J. at 399.

Therefore, in order to find the appellant guilty, we must be convinced beyond reasonable doubt that he "knew, or reasonably should have known" that JCH was "incapable of consenting"—that she "'lack[ed] the cognitive ability to appreciate the sexual conduct in question or the physical or mental ability to make [or] communicate a decision about whether [she] agreed to the conduct.'" *United States v. Solis*, 75 M.J. 759, 76 (N-M. Ct. Crim. App. 2016) (quoting *United States v. Pease*, 74 M.J. 763, 770, *aff'd*, 75 M.J. 180 (C.A.A.F. 2016) (second alteration in original)), *aff'd on other grounds*, 76 M.J. 127, (C.A.A.F. 2017) (summary disposition).

After carefully reviewing the record of trial and considering all of the evidence in a light most favorable to the prosecution, we are convinced that a rational factfinder could have found that JCH was incapable of consenting to sexual activity with the appellant, and that JCH's condition of impairment was known or reasonably should have been known by the appellant. Furthermore, after weighing all the evidence in the record of trial and making allowances for not having personally observed the witnesses, we too are convinced beyond reasonable doubt of the appellant's guilt.

JCH's testimony was persuasive. She described her memory of the evening as "really foggy," with her vision "going in and out."[20] She testified that she was unable to talk, could not focus, and did not have control over her body. She remembers going into the bathroom, showering, falling onto the bathroom floor, then vomiting before the appellant began "touching [her] vagina" and "insert[ing] his fingers."[21] JCH next remembered lying on her stomach on the bed—unsure of how she got there—and the appellant trying to insert his penis in her vagina.

JCH's level of intoxication and impairment was substantially documented by TD, who described her as "wasted, probably the most drunk I've ever seen her."[22] TD explained how the appellant and JS picked up JCH off of TD's hotel room floor and carried her out. MD also testified that he observed JCH "acting like she was as little drunk," trying to get into a parked car in the hotel parking garage and then placing an orange traffic cone on top of the car, before lying on the ground and "throwing a fit."[23] Indeed, the appellant's text messages to JCH the morning after their encounter corroborate the sexual activity and JCH's level of impairment, conceding that they "messed around alot [sic] but when it was bad [I] stopped."[24] The appellant admitted to JCH that he knew she was "hammered,"[25] and that he digitally penetrated her and tried to put his penis in her vagina, before realizing "it wasn't working" because JCH was "falling and just really bad."[26] In another set of text messages with MD, the appellant was frantic and distraught over the thought of JCH reporting him. He texted MD, "[I] don[']t want her to go the police or [h]ospital for a kit done cuz [sic] [I] don[']t need that report,"[27] and he further explained:

> "I trie[d] to get it in towards the beginning when [I] said we messed around but couldn[']t so yea my shit [w]as touc[]hing her shit. But then it was over[. I] knew sh[e] was hammered and done so [I] kept fingering h[e]r and she was jerking my dick."[28]

---

[20] Record at 510.

[21] *Id.* at 514.

[22] *Id.* at 672.

[23] *Id.* at 776-77.

[24] PE 5 at 11.

[25] *Id.* at 2.

[26] *Id.* at 10.

[27] PE 6 at 4.

[28] *Id.* at 6.

JCH's testimony, the testimony of TD and MD regarding JCH's level of intoxication, and the appellant's admissions to both JCH and to MD that his attempts to have sex with JCH were unsuccessful because she was "hammered," and that he continued digitally penetrating her after she was "done," leave us convinced beyond a reasonable doubt of the appellant's guilt. Moreover, despite the consensual encounter with JCH the previous night and the appellant's self-serving assertions that JCH was participating in the charged sexual activity, we are further convinced, in light of the testimony of JCH, TD, MD and the appellant's text messages, that any belief by the appellant that JCH consented to the sexual activity was patently unreasonable.

## C. Reassessment of sentence

When setting aside specifications, this court will normally reassess the sentence in light of those changes. In this case, however, the members were specifically instructed that "[t]he offenses charged in the lesser included offense of Specification 2 of Charge I and the offense of Specification 2 of Charge II are one offense for sentencing purposes. Therefore, in determining the appropriate sentence in this case, you must consider them as one offense."[29] As we are convinced that the unreasonably multiplied charges did not affect the sentencing decision, we see no need to reassess the sentence.

## III. CONCLUSION

The finding of guilty of the lesser included offense to Specification 2 under Charge I is set aside and Specification 2 under Charge I is dismissed with prejudice. The remaining findings and sentence, as approved by the CA, are affirmed.

Senior Judge CAMPBELL and Judge FULTON concur.

For the Court



R.H. TROIDL
Clerk of Court

---

[29] Record at 1013.