# UNITED STATES NAVY–MARINE CORPS COURT OF CRIMINAL APPEALS

————————————————

## No. 201500326

————————————————

## UNITED STATES OF AMERICA
Appellee

v.

## CHRISTOPHER R. CLUGSTON
Sergeant (E-5), U.S. Marine Corps
Appellant

————————————————

Appeal from the United States Navy-Marine Corps Trial Judiciary

Military Judge: Lieutenant Colonel E.A. Harvey, USMC
Convening Authority: Commanding General, 3rd Marine Aircraft Wing, MCAS Miramar, San Diego, CA.
Staff Judge Advocate: Captain Anthony M. Grzincic, USMC.
Addendum: Colonel Daren K. Margolin, USMC.
For Appellant: Lieutenant Doug Ottenwess, JAGC, USN.
For Appellee: Lieutenant Commander Jeremy R. Brooks, JAGC, USN; Major Cory A. Carver, USMC.

————————————————

Decided 31 January 2017

————————————————

Before MARKS, FULTON, and GLASER-ALLEN,
*Appellate Military Judges*

————————————————

**This opinion does not serve as binding precedent, but may be cited as persuasive authority under NMCCA Rule of Practice and Procedure 18.2.**

————————————————

MARKS, Senior Judge:

A panel of members with enlisted representation, sitting as a general court-martial, convicted the appellant, contrary to his pleas, of one specification of sexual assault, in violation of Article 120, Uniform Code of

Military Justice (UCMJ), 10 U.S.C. § 920 (2012).[1] The members sentenced the appellant to 24 months' confinement, reduction to pay grade E-1, forfeiture of all pay and allowances, and a dishonorable discharge. The convening authority approved the sentence as adjudged and, except for the punitive discharge, ordered the sentence executed.

The appellant asserts four assignments of error (AOE): (1) the evidence is legally and factually insufficient; (2) the military judge committed prejudicial error instructing the members on voluntary intoxication and unconsciousness; (3) the charge of engaging in a sexual act with someone incapable of consenting due to impairment is unconstitutionally vague; and (4) the military judge committed plain error instructing the members, "[i]f, based on your consideration of the evidence, you are firmly convinced that the accused is guilty of the crime charged, you must find him guilty."[2] After carefully considering the pleadings and the record of trial, we find no error materially prejudicial to the substantial rights of the appellant and affirm the findings and sentence. Arts. 59(a) and 66(c), UCMJ.

## I. BACKGROUND

On the evening of 7 February 2014, the appellant, victim Lance Corporal (LCpl) JSM, and witnesses Corporal (Cpl) W and Cpl S, all members of the same unit, were hanging out at a barracks smoke pit. The appellant, a married sergeant who lived off-base, planned to spend the night in the barracks with Cpl W so they could leave on a hiking trip the next day. Cpl W, Cpl S, and the appellant joined LCpl JSM at the smoke pit gathering and spent several hours smoking hookah, eating pizza, and drinking beer.

Sometime around 2300, LCpl JSM felt "too drunk" and decided to return to her room on the third deck of a nearby barracks for the night. All four Marines made their way to LCpl JSM's room, with LCpl JSM leaning on the appellant and Cpl W for support. However, when they reached LCpl JSM's room, it was the appellant who collapsed on the floor from the effects of alcohol. When Cpl W and Cpl S could not rouse the appellant from where he lay, LCpl JSM said he could stay in her room for the night. She continued to converse with Cpl W and Cpl S, laughing and giggling, for about ten minutes

---

[1] The members acquitted the appellant of a single specification of sexual assault of someone asleep, unconscious, or otherwise unaware, in violation of Article 120(b)(2), UCMJ.

[2] We found no error in the use of the same challenged reasonable doubt instruction in *United States v. Rendon*, 75 M.J. 908, 916-17 (N-M. Ct. Crim. App. 2016) *petition for rev. filed*, No. 17-0168,__ M.J. __(C.A.A.F. 30 Dec 2016), and in accordance with that holding, we summarily reject this AOE. *United States v. Clifton*, 35 M.J. 79, 81 (C.M.A. 1992).

before falling asleep on her rack, still fully clothed. Cpl W and Cpl S removed LCpl JSM's boots and rolled the appellant on his side in case he vomited. Concerned about both intoxicated Marines, Cpl W decided to sleep in an open rack in LCpl JSM's room. There had been no flirtation or signs of any sexual interest between the appellant and LCpl JSM, so preventing a sexual assault was not foremost in Cpl W's mind.

During the night, LCpl JSM woke to pain in her vagina and something heavy on top of her and began screaming. She pushed the appellant off of her body and onto the floor. He was no longer wearing pants. Cpl W awoke to LCpl JSM's screams and pleas for help and after a few moments hunting for a light switch, turned on the lights. LCpl JSM was sitting up in bed with a blanket wrapped around her and all of her clothes on the floor surrounding her bed. The appellant, appearing disoriented, put on his shirt and pants and left the room. Cpl W left to obtain contact information for a Uniform Victim Advocate. LCpl JSM reported the assault that night and underwent a sexual assault forensic examination the next day. Forensic analysis of the swabs from LCpl JSM's examination revealed semen and the appellant's DNA.

The appellant pursued an affirmative defense of sexsomnia, or sexual activity during sleep, which is a type of parasomnia, or sleepwalking. Sexsomnia is a form of automatism, or involuntary conduct during a state of unconsciousness. Trial defense counsel presented evidence of the appellant's childhood history of sleepwalking and expert testimony on sexsomnia. A battle of the experts ensued, as the counsel litigated parasomnia, sexsomnia, and the effects of alcohol on sleep.

## II. DISCUSSION

### A. Legal and factual sufficiency

The appellant alleges that his conviction is legally and factually insufficient on two points: (1) that the evidence failed to show that LCpl JSM was incapable of consenting to sex because of impairment by alcohol; and (2) that the appellant was unable to form the necessary criminal intent because he was unconscious during his sexual act with LCpl JSM.

We review the legal and factual sufficiency of evidence *de novo*. Art. 66(c), UCMJ; *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002). The test for legal sufficiency of the evidence is "whether, considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 324 (C.M.A. 1987) (citation omitted). "For factual sufficiency, the test is whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, the members of the [appellate court] are themselves convinced of

the accused's guilt beyond a reasonable doubt." *Id.* at 325. "By 'reasonable doubt' is not intended a fanciful or ingenious doubt or conjecture, but an honest, conscientious doubt suggested by the material evidence or lack of it in this case. . . . The proof must be such as to exclude not every hypothesis or possibility of innocence, but every fair and rational hypothesis except that of guilt." *United States v. Loving*, 41 M.J. 213, 281 (C.A.A.F. 1994).

### 1. *Proof of incapacity to consent to sex because of impairment by alcohol*

It is a sexual assault in violation of Art. 120(b)(3), UCMJ, to "commit[] a sexual act upon another person when the other person is incapable of consenting to the sexual act due to—(A) impairment by any drug, intoxicant, or other similar substance, and that condition is known or reasonably should be known by the person."

Proving incapacity to consent to a sexual act because of impairment from alcohol requires more than proving intoxication. *United States v. Pease*, 74 M.J. 763, 770 (N-M. Ct. Crim. App. 2015), *aff'd*, 75 M.J. 180 (C.A.A.F. 2016). In delineating that higher evidentiary threshold in *Pease*, this court pointed to the definition of consent in the statute: "'a freely given agreement to the conduct at issue by a competent person . . . .'" *Id.* (quoting Art. 120(g)(8), UCMJ). A competent person has the "physical and mental ability to consent," while an incompetent person "lacks either the mental or physical ability to consent." *Id.* The culprit may be alcohol or another "cause enumerated in the statute." *Id.* Lacking the capability to consent to sexual conduct means "lack[ing] the cognitive ability to appreciate the sexual conduct in question or the physical or mental ability to make and to communicate a decision about whether they agreed to the conduct." *Id.* In other words, the focus of the evidentiary inquiry is the alleged victim's awareness or ignorance of the sexual conduct pending or in progress and capacity or incapacity to consent to or oppose it, either verbally or physically.

While there is ample evidence that LCpl JSM drank alcohol to the point of intoxication on 7 February 2014, we agree with the appellant that her impairment did not render her incapable of consenting to a sexual act *while she was awake*. On a scale of one to ten, with ten being "passed out, close to being alcohol poisoned[,]"[3] Cpl W described LCpl JSM as a six.[4] Cpl S remembered the appellant being the most intoxicated person and LCpl JSM being "sober and coherent enough to have a conversation" and not "really intoxicated."[5]

---

[3] Record at 245.

[4] *Id.* at 246.

[5] *Id.* at 307-08.

LCpl JSM testified to clear, largely intact memories of that night, up until she climbed into bed to sleep. She began drinking shortly before 1800 and consumed about two slices of pizza and more than 12 beers over a six to eight hour period. On a normal weekend, LCpl JSM drank about eight beers. But on 7 February, she drank until she "felt too drunk" then decided to call it a night and head to her barracks room.[6] Although she could not walk straight and leaned on the appellant and Cpl W for support, LCpl JSM climbed the two flights of stairs to her barracks room under her own power. She remembered the appellant slumping to the floor of her barracks room, and when Cpl W could not rouse him, she recalled telling Cpl W, "[l]eave him there; he'll be okay."[7] According to Cpl W, LCpl JSM was "laughing and giggling and just like how drunk people are, like happy drunks."[8] Cpl W and Cpl S sat down and talked to LCpl JSM for about ten minutes, as she was not interested in going to sleep. LCpl JSM denied needing help climbing into bed and insisted she lay on top of the covers. She did not undress, leaving on a hooded sweatshirt, tank top, bra, a pair of tight skinny jeans, underwear, and boots. The inconsistencies between her testimony and that of Cpl W and Cpl S revealed only a few forgotten details. She did not remember that it was a Friday vice a Saturday, that Cpl S was also in her room, or that Cpl W and Cpl S removed her boots and made a joke about "tucking her in."[9] By midnight, both LCpl JSM and the appellant were asleep. Carefully considering all of this evidence, we conclude that before she fell asleep, LCpl JSM was capable of consenting to sexual conduct.

LCpl JSM woke abruptly when she felt "pain in [her] vagina and something heavy on top of [her.]"[10] "[N]early immediate[ly]" or within maybe as long as a minute, LCpl JSM used her hip to bump the person off of her,[11] yelled, "[h]e's on top of me, he's on top of me," and started hitting him in the face.[12] LCpl JSM recognized he was the appellant when she saw his blond hair by ambient light coming in her window from the parking lot. She remembered hearing him say, "ouch" and seeing him roll under her bed.[13] Because "he didn't have pants on," she knew it was the appellant's penis that

---

[6] *Id.* at 273.

[7] *Id.* at 277.

[8] *Id.* at 247.

[9] *Id.* at 309.

[10] *Id.* at 280.

[11] *Id.* at 282.

[12] *Id.* at 252.

[13] *Id.* at 281-82.

had penetrated her.[14] Remembering that black-haired Cpl W was in the room and eliminating him as the person she had knocked to the floor, she began screaming his name. She realized she was not wearing any clothes and saw them on the floor around her bed. By the time Cpl W turned on the lights in the room, LCpl JSM was sitting up in bed, covering herself with a blanket. LCpl JSM described still feeling "a little drunk" when she awoke but remembering everything clearly.[15] Cpl W testified she was awake and able to articulate what had happened to her.

As the appellant points out, this case is similar to *United States v. Mohead*, No. 201400403, 2015 CCA LEXIS 465, unpublished op. (N-M. Ct. Crim. App. 29 Oct 2015), *rev. denied*, 75 M.J. 288 (C.A.A.F. 2016), an unpublished opinion in which this court found insufficient evidence of the victim's incapability to consent because of alcohol impairment. In *Mohead*, the victim had also drunk to the point of intoxication and fallen asleep before waking to the appellant on top of her engaging in sexual intercourse. A witness in the room heard the victim question the appellant's actions, tell him to stop, and remind him that he was like a brother and protector to her. This court held that the victim's "actions upon waking indicate she was then capable of consenting despite the earlier alcohol consumption. While trying to 'reason with' the appellant, she articulated her clear understanding of what was happening, that she thought it was wrong, and that she did not consent." *Id.* at *11. The conviction for sexual assault while the victim "was incapable of consenting to the sexual act due to impairment by alcohol" was thus set aside for factual insufficiency. *Id.* at *10-11. Like the victim in *Mohead*, LCpl JSM was able to perceive what was happening to her when she awoke and communicate her lack of consent.

However, while the evidence fails to establish that LCpl JSM was incapacitated due to alcohol during the two periods before she fell asleep and after she awoke, it is sufficient to find that LCpl JSM's impairment caused her to remain asleep long after she should have awoken to the appellant's sexual advances.

Before considering the combined effects of sleep and alcohol, we must address the members' decision to acquit the appellant of committing a sexual act upon LCpl JSM while she slept, in violation of Art. 120(b)(2), UCMJ. The government charged two provisions of the sexual assault statute for a single incident, presumably allowing for contingencies of proof. The military judge did not instruct the members about contingencies of proof, but in his closing argument, trial counsel told the members, "[s]o it's not an either-or

---

[14] *Id.* at 281.

[15] *Id.* at 295.

proposition, he's actually guilty of both of these offenses. Now, don't worry about him being punished double. That's not going to happen. If you find him guilty of both of the specifications, they'll be merged through sentencing."[16] For reasons known only to the members, they found the appellant guilty of a sexual act upon LCpl JSM when she was incapable of consenting because of alcohol but not guilty of committing a sexual act upon LCpl JSM while she was asleep, unconscious, or otherwise unaware.

The inconsistent verdict does not bind us. Our review of the sufficiency of the evidence "should be independent of the jury's determination that evidence on another count was insufficient." *United States v. Powell*, 469 U.S. 57, 67 (1984). We need not set aside the appellant's conviction "merely because the verdicts cannot rationally be reconciled." *Id*. at 69. The acquittal of sexual assault while LCpl JSM slept does not prevent us from considering the evidence supporting that specification in support of the remaining specification of sexual assault. *United States v. Gutierrez*, 73 M.J. 172, 175 (C.A.A.F. 2014). Therefore, we may take into account evidence that LCpl JSM was asleep in analyzing evidence that she was also incapacitated because of impairment by alcohol.

The evidence shows that LCpl JSM awoke to find the appellant on top of her, engaged in intercourse. She had fallen asleep on her back, covered in a blanket and wearing all of her clothes. While LCpl JSM slept, the appellant pulled her hooded sweatshirt and tank top over her head and pulled the sweatshirt sleeves off her arms. He had to lift her torso again to unhook her bra behind her back and remove it. Her tight skinny jeans had to be unbuttoned, unzipped, and pulled over her hips and buttocks and all the way down her legs. LCpl JSM testified that while it was "[n]ot extremely difficult" to remove her jeans, it "require[d] being sober."[17] Whether the appellant removed her jeans by pulling from the waistband or the cuffs, LCpl JSM apparently did not notice. Despite all the manipulation of LCpl JSM's body required to remove her clothing, it was not until after the appellant penetrated her that she awoke.

LCpl JSM's failure to wake while the appellant undressed her is consistent with sleep deepened and prolonged by alcohol. According to LCpl JSM, she slept more deeply and woke more slowly when she drank. She described someone needing to shake her awake when she had been drinking. Expert witnesses testified that alcohol initially increases deep, "slow-wave

---

[16] *Id*. at 541.

[17] *Id*. at 292.

sleep" and raises the arousal threshold, making it harder to wake the sleeper.[18]

One would reasonably expect the sensation of heavy, tight-fitting clothing being pulled over the head, off the arms, and down the legs to wake an ordinary sleeper. We conclude that alcohol dulled LCpl JSM's senses beyond the normal effects of sleep and precluded her awareness of actions leading imminently to sexual conduct. Unable to appreciate what was happening to her, she was also unable to resist verbally or physically until the pain of penetration finally woke her. The appellant, who had spent hours drinking with LCpl JSM that evening and helped her climb the steps to her room, knew or should have known that she remained asleep despite his removal of her clothing, and her consumption of alcohol was the likely reason.

We are convinced, beyond a reasonable doubt, that LCpl JSM remained asleep through the appellant's removal of her clothing, which would reasonably be expected to wake the sober sleeper, and was thus incapable of consenting to his sexual act because of impairment by alcohol.

### 2.  *Proof the appellant consciously committed the sexual act*

The appellant alleges that the government failed to prove beyond a reasonable doubt that he was conscious when he committed a sexual act upon LCpl JSM, thus the government did not prove the voluntary conduct necessary to convict him of this offense.

When an accused presents evidence that reasonably calls into question his or her state of consciousness during the commission of the alleged offenses and the voluntariness of the conduct, the government must prove consciousness beyond a reasonable doubt. *United States v. Torres*, 74 M.J. 154, 157 (C.A.A.F. 2015). In *Torres*, the Court of Appeals for the Armed Forces (CAAF) recognized "automatism" as an affirmative defense, despite its absence from RULE FOR COURTS-MARTIAL (R.C.M.) 916[19], MANUAL FOR COURTS-MARTIAL, UNITED STATES (2012). 74 M.J. at 157. The CAAF defined automatism as "'[a]ction or conduct occurring without will, purpose, or reasoned intention,' 'behavior carried out in a state of unconsciousness or

---

[18] *See Id.* at 382, 498, 511.

[19] R.C.M. 916 defines affirmative defenses as "any special defense which, although not denying that the accused committed the objective acts constituting the offense charged, denies, wholly or partially, criminal responsibility for those acts." R.C.M. 916(a). Once the evidence suggests an affirmative defense might apply, the burden is on the government to prove beyond a reasonable doubt that the defense did not in fact exist. *Id.* at (b)(1). But there are three exceptions, including lack of mental responsibility stemming from disease or defect, where the burden is on the accused to prove that the defense existed. *Id.*

mental dissociation without full awareness,' and '[t]he physical and mental state of a person who, though capable of action, is not conscious of his or her actions,'" and an "'unconsciousness defense.'" *Id.* at 156 n.3 (citations omitted) (alterations in original).[20]

The CAAF rejected the military judge's characterization of epileptic seizure-induced automatism as a mental disease or defect, finding instead that automatism belonged in the larger category of affirmative defenses that the government must disprove beyond a reasonable doubt. *Id.* at 158. "A person is not guilty of an offense unless his liability is based on conduct that includes a voluntary act[,]" and "'voluntary acts'" do not include bodily "movements during unconsciousness." *Id.* (citing MODEL PENAL CODE § 2.01 (1962)). Automatism, manifesting as involuntary conduct, often in a state of unconsciousness, implicates not only the *mens rea* but also the *actus reus* necessary to commit a crime. *Id.* at 157. ("Accordingly, an accused cannot be held criminally liable in a case where the actus reus is absent because the accused did not act voluntarily, or where mens rea is absent because the accused did not possess the necessary state of mind when he committed the involuntary act."). Looking at it as two sides of the same coin, the government must either disprove an accused's suggestion of involuntary conduct during unconsciousness or prove consciousness and the voluntariness of the accused's conduct to secure a conviction.

In this case, the appellant reasonably raised an affirmative defense of automatism with evidence he had a personal and family history of sleepwalking, or parasomnia. His trial defense counsel offered expert testimony that his heavy drinking on 7 February triggered an episode of parasomnia, or more specifically, sexsomnia, during which he engaged in sexual conduct with LCpl JSM while he was unconscious. As will be discussed in greater depth when we address AOE 2 *infra*, the military judge concluded that the government had the burden to prove the appellant's consciousness beyond a reasonable doubt.

We focus our inquiry into the evidence of the appellant's consciousness on his conduct from the moment he arose from LCpl JSM's barracks room floor in the early morning hours until she awoke to discover him on top of her. There is no real dispute that the appellant lay unconscious on the floor

---

[20] "Clinically automatism or unconsciousness has manifested itself in epileptic and postepileptic states, clouded states of consciousness associated with organic brain disease, concussional states following head injuries, schizophrenic and acute emotional disturbances, metabolic disorders such as anoxia and hypoglycemia, drug-induced loss of consciousness, sleepwalking, and hypnagogic states." Eunice A. Eichelberger, Annotation, *Automatism or Unconsciousness as Defense to Criminal Charge*, 27 A.L.R.4th 1067 (1984).

earlier in the night when Cpl W turned off the lights in the room. By the time the lights came back on some time later, LCpl JSM had screamed in the appellant's ear, and he had landed hard on the floor, received LCpl JSM's blows to his face, and been blinded by the sudden illumination of the overhead lights. The appellant appeared to be aware of what had just occurred, although it is impossible to know whether he remembered the sexual act with LCpl JSM or simply deduced it from the circumstances. Nevertheless, he was awake and conscious. We must determine whether the government proved he was conscious during the intervening acts in the darkened room.

Robust expert testimony on parasomnia revealed significant inconsistencies between the appellant's behavior and involuntary actions during sleep. The government's expert witness in sleep disorders testified that "virtually all" reports of sexsomnia involve "routinized, repetitive, ordinary circumstances, are in the home, in the bed with the usual bed partner."[21] The rare occasion when sexsomnia affects a stranger usually occurs when two people fall asleep next to each other. The appellant's expert witness gave the example of a father inappropriately touching his daughter while he slept surrounded by his children in a tent. The defense expert testified that his clinical practice consisted only of patients who behaved sexually toward their spouses or partners. He only saw cases of sexsomnia outside of a relationship in his "legal practice," which involved consulting and testifying on legal cases.[22]

Complex behavior is also unusual during episodes of parasomnia or sexsomnia. The government's expert considered removal of LCpl JSM's tight-fitting clothing "far too detailed and not the kind of behavior that a sleepwalker engages in. And there's a complexity to it that I don't feel is consistent with parasomnia."[23] When asked about the kind of complex behavior that can occur during parasomnia, the appellant's expert cited driving a car. While driving can necessitate clear-eyed perception and sharp reflexes, it is often a routine, repetitive behavior described as second-nature.

Even if there is lingering doubt about the appellant's consciousness, his affirmative defense of automatism survives only if the evidence points to parasomnia as opposed to voluntary intoxication alone. *See Torres*, 74 M.J. at 158 (holding that the trial court's failure to hold the government to its burden of proving consciousness was harmless beyond a reasonable doubt in light of

---

[21] Record at 480.

[22] *Id.* at 393.

[23] *Id.* at 491.

the government's effective rebuttal of Torres' shaky evidence of epileptic seizure-induced automatism and his diagnosis of alcohol abuse).

The primary evidence that the appellant suffered from sexsomnia was his family and personal history of parasomnia. But his sleepwalking experiences were distant in time and very different from the acts alleged. The appellant's father testified about regularly finding the appellant out of bed in the middle of the night as a child, looking for something in the refrigerator or in a cabinet, while asleep. The most recent parasomnia episode cited occurred shortly after the appellant enlisted in the Marine Corps, eight or nine years before the night of 7 February 2014. During that incident, the appellant, who had been drinking, headed out the front door of his parents' home in the early morning hours. When his father questioned where he was going, the appellant responded, "[w]ell, I've got to go and take care of this" but was asleep.[24]

The appellant presented no evidence of more recent parasomnia or any incidents of sexual activity while asleep. His wife of eight years never witnessed any parasomnia or sexsomnia; however, the appellant always refrained from drinking alcohol around her. Nevertheless, he was unable to offer a former roommate, fellow Marine, friend, or any other witness who could relay an occasion of parasomnia in a barracks room, on a deployment, or after a night of drinking with friends.

The counsel vigorously litigated the role of alcohol in precipitating parasomnia. The appellant's expert identified alcohol, exercise, and stress as risk factors for parasomnia in someone predisposed to it. While it appears conditions were ideal for the appellant to experience parasomnia the night of 7 February, those conditions were hardly unique. It again begs the question why he had not walked or otherwise acted out in his sleep in eight or nine years, whether sober or intoxicated. Alcohol's role amplifying early phases of deep sleep and destabilizing the transition out of deep sleep helps explain the timing of the appellant's actions. But the increased likelihood that the appellant would stir when he did does not point to parasomnia over a simple interruption in drunken sleep. The appellant's disorientation in the minutes after LCpl JSM tossed him off her may be consistent with someone experiencing parasomnia, but it is nearly ubiquitous in inebriation. When asked how he knew the appellant suffered from sexsomnia as opposed to an "exclusively . . . alcohol-related event," the appellant's expert witness pointed only to the appellant's good military character.[25]

---

[24] *Id*. at 320.

[25] *Id*. at 365-66, 372-73.

The evidence that supported sexsomnia as a hypothesis about the appellant's behavior does not ultimately survive scrutiny. We are convinced beyond a reasonable doubt that the appellant did not suffer from an episode of parasomnia or sexsomnia when he committed a sexual act on a sleeping LCpl JSM. Ultimately, we need not decide whether the government proved consciousness beyond a reasonable doubt, because as we will discuss next, unconsciousness resulting from nothing more than voluntary intoxication is not a defense to sexual assault.

## B. Military judge's instructions on unconsciousness and voluntary intoxication

The appellant argues that the military judge erroneously conflated instructions about his possible unconsciousness and voluntary intoxication and prejudiced him by preventing the members' full consideration of his defense of parasomnia.

We review a military judge's instructions to members *de novo. Torres*, 74 M.J. at 157 (citing *United States v. McDonald*, 57 M.J. 18, 20 (C.A.A.F. 2002)). A military judge's instructional error is harmless if it is "'clear beyond a reasonable doubt that a rational jury would have found the [appellant] guilty absent the error.'" *Id.* at 157 (quoting *McDonald*, 57 M.J. at 20).

### 1. *Automatism and Torres*

Having concluded that automatism implicated the *actus reus* as well as the *mens rea* of an offense in *Torres*, the CAAF established an instructional requirement. 74 M.J. at 158. "[I]n those cases where the evidence reasonably raises the issue of automatism, military judges must instruct panels accordingly." *Id.* The CAAF did not suggest specific language for such an instruction, but two points are necessary: (1) "automatism may serve to negate the actus reus of a criminal offense[,]" and (2) the government has the burden to disprove automatism and prove conscious, voluntary conduct beyond a reasonable doubt. *Id.*

Mindful of this newly published *Torres* opinion, the military judge in this case concluded that evidence of the appellant's sleepwalking triggered the need for the automatism instruction. But evidence of the appellant's voluntary intoxication also necessitated an instruction that voluntary intoxication was not a defense. The military judge instructed the members as follows:

> The accused is not guilty of sexual assault if he acted while unconscious. Someone is unconscious when he or she is not conscious of his or her actions. Someone may be unconscious even though able to move. Unconscious acts may be caused by parasomnia, or sleepwalking.

The defense of unconsciousness may not be based upon voluntary intoxication. Voluntary intoxication is not a defense to sexual assault. A person is voluntarily intoxicated if he becomes intoxicated by willingly using any intoxicating drink or other substance knowing that it could produce an intoxicating effect. If you conclude that the accused's actions were a result of voluntary intoxication, then the accused's state of consciousness or lack thereof shall not be considered as a defense to the offense.

The Government must prove beyond a reasonable doubt that the accused was conscious when he acted. If there is proof beyond a reasonable doubt that the accused acted as if he were conscious, you should conclude that he was conscious, unless based on all of the evidence, you have a reasonable doubt that he was conscious, in which case you must find him not guilty.[26]

Before turning to the appellant's allegations about the voluntary intoxication instruction, we find that the instructions given contained the necessary elements mandated in *Torres*. The military judge clearly instructed the members that unconsciousness negated guilt and assigned the burden of proving consciousness beyond a reasonable doubt to the government.

### 2. *Voluntary intoxication*

R.C.M. 916 specifically excludes voluntary intoxication as an affirmative defense, with one exception. R.C.M. 916(l)(2). An accused may offer evidence of voluntary intoxication "for the purpose of raising a reasonable doubt as to the existence" of a mens rea when that mens rea is a required element of the offense. *Id*. The sexual assault offenses alleged in this case required only general intent, not specific intent. The military judge concluded, with trial defense counsel's agreement,[27] that an instruction regarding voluntary intoxication as an affirmative defense to sexual assault did not apply in this case. For this reason, we disagree with the appellant's contention that the military judge improperly "conflate[d] voluntary intoxication, a factor that goes to the mens rea of an offense, with unconsciousness, which as CAAF held in *Torres*, would negate the actus reus of an offense."[28] Instead, the military judge gave an instruction about "the difference between somebody

---

[26] *Id*. at 534.

[27] Appellate Exhibit (AE) XXXII at 4.

[28] Appellant's Brief and Assignment of Error of 11 Feb 2016 at 23.

who is acting [involuntarily] out of parasomnia and somebody who is acting [involuntarily] out of intoxication[.]"[29]

The military judge's instructions highlighting the law regarding voluntary intoxication and the defense of unconsciousness are consistent with R.C.M. 916 and the Model Penal Code provisions on which the CAAF relied so heavily in *Torres*. 74 M.J. at 158. R.C.M. 916 specifically excludes "*voluntary* intoxication" as an affirmative defense. R.C.M. 916(l)(2) (emphasis added). The Model Penal Code provision on Intoxication mirrors R.C.M. 916(l)(2): "Except as provided in Subsection (4) of this Section, intoxication of the actor is not a defense unless it negatives an element of the offense." MODEL PENAL CODE § 2.08(1) (1962). Subsection (4) draws the distinction between voluntary and involuntary intoxication and goes beyond mens rea to implicate *actus reus*: "Intoxication that (a) is not self-induced or (b) is pathological is an affirmative defense if by reason of such intoxication the actor at the time of his conduct lacks substantial capacity either to appreciate its criminality . . . or to conform his conduct to the requirements of the law." *Id.* § 2.08(4). In other words, involuntary intoxication may negate both the mens rea and actus reus of an offense and thus qualify as unconsciousness and automatism, but voluntary intoxication does not.

Finding no military instructions addressing evidence reasonably raising both automatism and voluntary intoxication, the military judge borrowed language from the California jury instructions on Unconsciousness[30] and Voluntary Intoxication Causing Unconsciousness: Effects on Homicide Crimes.[31] Trial defense counsel conceded that "the defense of unconsciousness

---

[29] Record at 88.

[30] California state courts use the following instruction on unconsciousness as a defense:

> The defendant is not guilty of . . . if (he/she) acted while unconscious. Someone is unconscious when he or she is not conscious of his or her actions. [Someone may be unconscious even though able to move.]
>
> Unconsciousness may be caused by (a blackout[,]/ [or] an epileptic seizure[,]/ [or] involuntary intoxication[,]/ . . .).
>
> [The defense of unconsciousness may not be based on voluntary intoxication.]

JUDICIAL COUNCIL OF CALIFORNIA CRIMINAL JURY INSTRUCTIONS (CALCRIM) No. 3425 (2016 ed.).

[31] "A person is *voluntarily intoxicated* if he or she becomes intoxicated by willingly using any intoxicating drug, drink, or other substance knowing that it could produce an intoxicating effect, or willingly assuming the risk of that effect." CALCRIM No. 626.

may not be based on voluntary intoxication"[32] but was concerned that members might interpret the instructions to dictate that the voluntary intoxication which precipitated the appellant's alleged parasomnia actually negated his defense. To alleviate this concern, trial defense counsel proposed instructions that accommodated voluntary intoxication as a "contributing factor" to parasomnia and excluded unconsciousness that was "*solely* a result of voluntary intoxication" and "based *just* on voluntary intoxication."[33] The military judge rejected the proposed changes, believing they did not adequately state the law.[34]

The appellant argues that the military judge's ultimate instructions misstated the law and misled the members into believing that the appellant's voluntary intoxication disqualified him from the affirmative defense of unconsciousness. We disagree. Although the military judge did not address the relationship between parasomnia and voluntary intoxication in her instructions, she presented them separately as independent causes of unconsciousness. She directed the members to consider "all of the evidence," which included extensive testimony about parasomnia and its precipitating factors, as a potential source of reasonable doubt as to the appellant's consciousness.[35] If the members found reasonable doubt, they were to find the appellant not guilty, not just unconscious. This distinction favored the appellant because it prompted the members to acquit him without reminding them to distinguish between parasomnia and voluntary intoxication as the cause of his unconsciousness.[36] But even assuming *arguendo* there was error in the military judge's instructions, we find that error harmless beyond a reasonable doubt.

---

[32] Record at 453.

[33] AE XLII at 1 (emphasis added).

[34] AE XLIII at 1.

[35] Record at 534. *See People v. Mathson*, 149 Cal. Rptr. 3d 167, 183-84, 189 (Cal. App. 3d Dist. 2012) (finding that jurors should be instructed to consider all evidence about the proffered cause of unconsciousness before concluding the accused was conscious).

[36] *See* Record at 455. The military judge cited *Mathson* as a model for her instructions. The *Mathson* court specifically criticized steering members toward a not guilty verdict before requiring them to determine the cause of unconsciousness. *Mathson*, 149 Cal. Rptr. 3d at 189. ("A defendant who was unconscious may still be found guilty if the intoxication was voluntary. Because the last sentence compels the jury to reach a not guilty verdict instead of compelling a finding regarding unconsciousness, that sentence is potentially confusing.")

Faced with two possible interpretations of an instruction, we are confident that the members would not choose an interpretation that rendered the preceding evidence, arguments, and instructions moot. "[I]nstructions are not to be considered in a vacuum[.]" *United States v. Woodard*, 17 C.M.R. 813, 835 (A.F.B.R. 1954). The evidence of the appellant's voluntary intoxication on 7 February 2014 was not in dispute. If the members believed voluntary intoxication automatically disqualified him from the defense of parasomnia, they would have to reconcile their interpretation with an absurdly incongruent court-martial. They would have to believe that the appellant bet his future on an unavailable defense, trial defense counsel and trial counsel both suffered from the same misunderstanding of the law, and for no apparent reason, the military judge required the government to prove consciousness beyond a reasonable doubt. Instead, we are convinced beyond a reasonable doubt that the members interpreted the instruction to leave parasomnia on the table as an available affirmative defense, even in light of the appellant's voluntary intoxication. We believe that rational members would have reached the same verdict absent this purported instructional error, thus we find no merit in this AOE.

## C. Unconstitutional vagueness of Article 120(b)(3)(A), UCMJ

Finally, the appellant avers that Article 120(b)(3)(A), UCMJ, is unconstitutionally vague, both on its face and as applied, because the term "impairment" does not provide sufficient notice of the prohibited conduct.

In *United States v. Solis*, 75 M.J. 759, 763 (N-M. Ct. Crim. App. 2016), we held that Article 120(b)(3) is not unconstitutionally vague, because it "does not proscribe sexual acts with impaired people, but rather with people incapable of consenting to the conduct at issue because of their impairment—and even then, only when the inability to consent is known, or reasonably should be known, to an accused." Under this binding precedent, the appellant's AOE fails.

### III. CONCLUSION

The findings and sentence as approved by the convening authority are affirmed.

Judge FULTON and Judge GLASER-ALLEN concur.

For the Court



R.H. TROIDL

Clerk of Court

16