# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

————————————

**No. ACM 39698**

————————————

**UNITED STATES**
*Appellee*

**v.**

**Theodore J. BRUNSON**
Airman Basic (E-1), U.S. Air Force, *Appellant*

————————————

Appeal from the United States Air Force Trial Judiciary

Decided 2 December 2020

————————————

*Military Judge:* Bradley A. Morris.

*Approved sentence:* Dishonorable discharge, confinement for 2 years, and forfeiture of $819.00 pay per month for 6 months. Sentence adjudged 21 December 2018 by GCM convened at Joint Base San Antonio-Lackland, Texas.

*For Appellant:* Major Rodrigo M. Caruço, USAF.

*For Appellee:* Lieutenant Colonel Brian C. Mason, USAF; Major Peter F. Kellett, USAF; Mary Ellen Payne, Esquire.

Before J. JOHNSON, POSCH, and KEY, *Appellate Military Judges*.

Chief Judge J. JOHNSON delivered the opinion of the court, in which Senior Judge POSCH and Judge KEY joined.

————————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4**

————————————

J. JOHNSON, Chief Judge:

A general court-martial composed of officer and enlisted members convicted Appellant, contrary to his pleas, of one specification of sexual assault and one specification of abusive sexual contact in violation of Article 120, Uniform Code

of Military Justice (UCMJ), 10 U.S.C. § 920, and one specification of attempted sexual assault in violation of Article 80, UCMJ, 10 U.S.C. § 880.[1,2] The court-martial sentenced Appellant to a dishonorable discharge, confinement for two years, and forfeiture of $819.00 pay per month for six months. The convening authority approved the adjudged sentence.

Appellant raises four issues on appeal, which we have consolidated into two issues for purposes of our analysis: (1) whether the evidence is legally and factually sufficient to support Appellant's convictions; and (2) whether the military judge failed to adequately instruct the court members with respect to findings. In addition, we consider whether Appellant is entitled to relief for facially unreasonable post-trial delay. We find no error that materially prejudiced Appellant's substantial rights, and we affirm the findings and sentence.

# I. BACKGROUND

Appellant's convictions arise from separate incidents in October 2017 involving two victims, AJ and RA, when Appellant was in technical training at Joint Base San Antonio-Lackland (JBSA-Lackland), Texas. We summarize each incident in turn.

## A. Abusive Sexual Contact of AJ

Appellant joined the Air Force in July 2017. During basic training he met RA, a female Airman trainee, through a mutual friend, and they frequently spent time together. After basic training, Appellant and RA remained at JBSA-Lackland for technical training specific to their career field. Appellant and RA were assigned to the same class in technical school. However, by mid-October 2017, Appellant and RA had both twice failed the initial week of their training. Appellant and RA had no romantic or sexual relationship to that point; RA's boyfriend at the time was another Airman trainee who had recently departed to California for training.

As a result of failing technical training, on 17 October 2017 Appellant reported to an unused classroom referred to as the "wash-back room," where students who had failed to progress in technical training waited either to resume their training, to be reassigned to another career field, or potentially to separate from the Air Force, depending on the Airman's particular circumstances. Also present in the wash-back room that morning were RA and a male Airman,

---

[1] All references in this opinion to the Uniform Code of Military Justice and Rules for Courts-Martial are to the *Manual for Courts-Martial, United States* (2016 ed.).

[2] The court-martial found Appellant guilty of one of two specifications of sexual assault. It found Appellant not guilty of the second specification, but guilty of the lesser-included offense of attempted sexual assault.

Airman First Class (A1C) LE. No instructors were present. The three Airmen were having a conversation when later in the morning they were joined by another female trainee, AJ.

AJ did not know the other individuals, but they invited her to join their conversation, and she sat next to them. Shortly thereafter, RA left the room. While RA was absent, A1C LE showed AJ a new tattoo he had on his arm, and invited her to feel the indentations on his skin.[3] As AJ ran her fingers along A1C LE's arm, Appellant, without invitation, took AJ's bare arm and began touching it in a similar manner. This made AJ uncomfortable, causing her to "kind of pull away from him" as she tried to continue her conversation with A1C LE. However, Appellant took her arm again and resumed rubbing it. When AJ pulled away from Appellant again, Appellant began rubbing the entire length of her upper leg, from her kneecap to her hip. When AJ turned her leg away from Appellant, he began rubbing her leg again, prompting AJ to shift her chair so that she was facing away from him. At no point did Appellant ask for AJ's consent to be touched. AJ estimated Appellant touched her leg for between three and five seconds on each of the two occasions. At trial, AJ stated that she believed the thigh rubbing was "sexual," and that Appellant "had some type of intentions . . . that he wanted something more than just friendship."

According to AJ, after she turned her chair away from Appellant to prevent him from rubbing her leg, Appellant began playing with her hair and blowing in her ear. This caused her to move her head and lean forward. In response, Appellant would pull her back into her chair by the shoulder, although not "forcefully." AJ felt "uncomfortable" and "awkward" about the situation; however, the three Airmen continued their conversation, and neither AJ nor A1C LE verbally told Appellant to stop touching AJ.

When RA returned to the room, she saw Appellant "laying over [AJ]" with "his chest . . . pressed up against her back and his arms over her shoulders." RA described the look on AJ's face as "utter discomfort and fear almost." RA told Appellant to get off AJ, and Appellant responded to the effect that he did not want to stop and AJ had not asked him to stop. Appellant "backed off" when RA threatened to throw away Appellant's food, and the conversation resumed. However, according to AJ, subsequently Appellant moved close to her again and began "massaging" her shoulder.

Eventually, Technical Sergeant (TSgt) CS, an instructor, looked into the room to check on the students. He saw Appellant "leaning over the back of

---

[3] All three Airmen had previously removed their uniform blouses and were wearing t-shirts.

[AJ's] chair in a very unprofessional fashion." AJ appeared "definitely . . . uncomfortable" and "kind of scared/taken aback." TSgt CS departed and then returned with another instructor, and they removed Appellant from the room. Later that day, instructors questioned AJ about the incident. AJ initially denied that she had been sexually assaulted or sexually harassed, although she also said she did not consent to Appellant touching her. AJ later testified that she was already distressed because she had just failed her technical training course and "didn't know what was going to happen," and she was afraid she would get in trouble for the incident with Appellant. The instructors brought AJ to the first sergeant, who had her write a statement. When the first sergeant asked AJ whether she wanted the matter investigated, AJ told him she did not. As a result of this incident, Appellant initially received a letter of reprimand, which was later withdrawn after the second incident described below.

**B. Sexual Assault and Attempted Sexual Assault of RA**

On 24 October 2017, one week after the incident with AJ in the wash-back room, RA underwent oral surgery to remove all four wisdom teeth.[4] As a result of the pain medication she received, RA had no memory from the time of her surgery on 24 October 2017 until she awoke early on the morning of 25 October 2017. When RA awoke, her cheeks were swollen. She used a phone application to send her sister photos of the stitches in her mouth, although opening her mouth caused "intense pain" in her jaw and tongue. RA then took one of the Percocet pills she had been prescribed for pain, and fell asleep.

RA awoke to Appellant knocking on her door and asking to come inside. At the time, RA was wearing only a long shirt, sports bra, and underwear. RA went to the door with a blanket wrapped around herself. RA saw it was Appellant, propped the door slightly open with a trash can, and went back to her bed. Her next memory was of Appellant lying next to her on the bed. RA told him to "get the f**k out of [her] bed." RA then fell asleep again, but awoke to Appellant's hand "above the blanket rubbing the insides of [her] thighs and occasionally between [her] thighs," specifically her vagina. RA again fell asleep. When she awoke, Appellant was penetrating her vagina with two fingers and "partially" penetrating or attempting to penetrate her anus with a finger. At that point, RA's "arms felt really weak and [she] felt like [she] couldn't scream or anything." RA lost consciousness again. When she awoke, Appellant still had his fingers in her vagina, and she believed he was masturbating. At that point, RA rolled over on her side and "squeezed [her] legs closed really hard together."

---

[4] The following account is based on RA's testimony at trial.

RA again fell asleep, but awoke when another Airman, A1C RC,[5] walked into the room to bring food for RA. According to RA, when A1C RC arrived, Appellant sat up very quickly and pulled up his pants. A1C RC testified at Appellant's trial that when he entered the room, he "heard somebody kind of like shuffle really quickly and [he] had noticed that [Appellant] was laying behind [RA] and kind of jumped when [A1C RC] walked in . . . ." Appellant then got off of the bed and walked past A1C RC to exit the room. As Appellant left, he told A1C RC that one of the instructors said Appellant "could check up on [RA]." A1C RC described RA's condition after Appellant left: "Her cheeks were swollen. She seemed kind of scared but she just didn't seem right. She could hardly sit up. She seemed really weak like she might have just taken her pain medication." After bringing the food to RA, A1C RC departed and "went on with [his] day."

According to RA, at some point after A1C RC left, Appellant returned and attempted to kiss her. RA forcefully turned her head away from Appellant, and he departed. RA fell asleep again. She testified to a vague memory of someone else bringing her food at a later point.

RA's next clear memory was of her roommate, A1C JM, returning to the room at the end of the duty day. A1C JM told RA that she had seen Appellant, who made a comment to her that RA was "hallucinating." RA attempted to stand up, but felt a "weird" sort of "ache" between her legs. RA began crying and told A1C JM to bring A1C RC. Several Airmen responded to the commotion, and two of them escorted RA to their instructors to report the incident. As a result, Air Force Office of Special Investigations (AFOSI) agents were contacted and initiated an investigation.

AFOSI agents interviewed Appellant in the course of their investigation. Appellant waived his rights and agreed to speak with the agents. Appellant stated he had visited RA's room four times on 25 October 2017, helping her prepare food, brush her teeth, and take her medication. Appellant acknowledged he lay down on RA's bed next to her, but initially he repeatedly denied he had touched RA's vagina or kissed her, because RA had a boyfriend and Appellant "respect[ed] boundaries." However, later in the interview Appellant claimed RA had started poking him playfully, and he had poked her back. When the agents challenged Appellant's version of events, he told them his truthfulness during the interview had been approximately "six" on a scale of ten. After further questioning, Appellant claimed RA had grabbed his hand and inserted his fingers in her vagina. Appellant claimed he resisted and pulled his hand away, but RA grabbed his hand and reinserted his fingers two

---

[5] A1C RC later separated from the Air Force and was a civilian at the time of Appellant's trial.

more times. Appellant also claimed RA pulled down his pants and attempted to masturbate him. Eventually, according to Appellant, he began "fingering" RA voluntarily because he was "in the moment." He acknowledged that at one point his finger went near RA's anus. Appellant also told the agents he kissed RA on her chest after she pulled her shirt up. Appellant estimated the penetration lasted approximately ten minutes, and he stopped when A1C RC entered the room.

## II. DISCUSSION

### A. Legal and Factual Sufficiency

#### 1. Law

We review issues of legal and factual sufficiency de novo. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citation omitted). Our assessment of legal and factual sufficiency is limited to the evidence produced at trial. *United States v. Dykes*, 38 M.J. 270, 272 (C.M.A. 1993) (citations omitted).

"The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Robinson*, 77 M.J. 294, 297–98 (C.A.A.F. 2018) (citation omitted). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted). As a result, "[t]he standard for legal sufficiency involves a very low threshold to sustain a conviction." *United States v. King*, 78 M.J. 218, 221 (C.A.A.F. 2019) (alteration in original) (citation omitted).

The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are] convinced of the [appellant]'s guilt beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987). "In conducting this unique appellate role, we take 'a fresh, impartial look at the evidence,' applying 'neither a presumption of innocence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt.'" *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (alteration in original) (quoting *Washington*, 57 M.J. at 399), *aff'd*, 77 M.J. 289 (C.A.A.F. 2018).

The elements of the specification of abusive sexual contact for which Appellant was convicted included the following: (1) that at or near JBSA-Lackland, on or about 17 October 2017, Appellant committed sexual contact upon AJ by touching her thigh with his hand; (2) that Appellant did so by causing

bodily harm to AJ, to wit: touching her thigh with his hand without her consent; and (3) that Appellant did so with an intent to gratify his sexual desire. *See Manual for Courts-Martial, United States* (2016 ed.) (*MCM*), pt. IV, ¶ 45.b.(7)(b). "The term 'bodily harm' means any offensive touching of another, however slight, including any non-consensual . . . sexual contact." *MCM*, pt. IV, ¶ 45.a.(g)(3).

The elements of the specification of sexual assault in violation of Article 120, UCMJ, for which Appellant was convicted included: (1) that at or near JBSA-Lackland, on or about 25 October 2017, Appellant committed a sexual act upon RA by penetrating her vulva with his finger; (2) that Appellant did so by causing bodily harm, to wit: penetrating RA's vulva with his finger without her consent; and (3) that Appellant did so with an intent to gratify his sexual desire. *See MCM*, pt. IV, ¶ 45.b.(4)(b).

The elements of the offense of attempted sexual assault in violation of Article 80, UCMJ, included: (1) that Appellant did a certain overt act; (2) that the act was done with the specific intent to commit a certain offense under the UCMJ; (3) that the act amounted to more than mere preparation; and (4) that the act apparently tended to effect the commission of the intended offense. *See MCM*, pt. IV, ¶ 4.b. The elements of the attempted offense of sexual assault by penetrating RA's anus with a finger are similar to the elements of sexual assault by penetrating RA's vulva for which Appellant was convicted, and include the following: (1) penetration of RA's anus by Appellant's finger with the intent to gratify his sexual desire; and (2) bodily harm by causing the penetration without consent. *See MCM*, pt. IV, ¶ 45.b.(4)(b).

### 2. Analysis

#### a. Abusive Sexual Contact of AJ

The Government introduced convincing evidence that Appellant committed abusive sexual contact of AJ by rubbing her thigh without her consent. AJ testified that Appellant rubbed her thigh twice, for approximately three to five seconds on each occasion. She testified that she did not consent, and in fact repeatedly shifted away from Appellant to avoid his touching. Appellant and AJ did not know each other prior to that morning, and nothing about their relationship implied that she would consent to such contact. Moreover, Appellant's rubbing of AJ's leg was part of a series of persistent actions he directed at her that also included rubbing her arm, playing with her hair, and blowing in her ear. AJ perceived sexual intent behind Appellant's rubbing her thigh, and a rational trier of fact could reasonably conclude Appellant intended to derive sexual gratification from the act. Although other witnesses did not specifically see or recall Appellant rubbing AJ's thigh, the testimonies of A1C LE, RA, and TSgt CS all reinforced AJ's testimony in that they described Appellant

7

as touching AJ in ways that were inappropriate in the circumstances, and that AJ appeared uncomfortable.

On appeal, Appellant does not directly challenge AJ's testimony, which he describes as a "credible, honest assessment of the events." He does not contest that AJ in fact did not consent to the contact. However, Appellant cites AJ's testimony that she initially thought the physical contact with her leg might have been accidental; he suggests this statement raises a reasonable doubt with respect to his guilt. We are not persuaded. Specifically, AJ testified on cross-examination that she thought "[t]he first time when he had started to do it, it was unintentional." However, AJ further testified that Appellant's persistent contact despite her efforts to avoid it left her with no doubt that the contact was in fact intentional. The evidence strongly supports that interpretation.

Appellant also emphasizes that AJ did not verbalize her discomfort or lack of consent at the time. Therefore, Appellant asserts, the evidence demonstrates that even if he had a sexual motivation, he acted "through ignorance or mistake of fact," and is therefore not guilty of the charge. Again, we are not persuaded. Assuming for purposes of analysis that Appellant honestly believed AJ consented to the contact, his belief was unreasonable, and therefore the special defense of ignorance or mistake of fact does not apply.

As we noted in *United States v. Lee*, No. ACM 39531 (f rev), 2020 CCA LEXIS 61, at *15 (A.F. Ct. Crim. App. 26 Feb. 2020) (unpub. op.), "[w]hether a mistake must be objectively reasonable as well as actual depends on the mens rea applicable to the element of the offense that is in question."

> If the ignorance or mistake goes to an element requiring premeditation, specific intent, willfulness, or knowledge of a particular fact, the ignorance or mistake need only have existed in the mind of the accused. If the ignorance or mistake goes to any other element requiring only general intent or knowledge, the ignorance or mistake must have existed in the mind of the accused and must have been reasonable under all the circumstances.

Rule for Courts-Martial (R.C.M.) 916(j)(1). As we further explained in *Lee*, abusive sexual contact under Article 120, UCMJ, is a general intent offense with respect to the element of absence of consent. *Lee*, unpub. op. at *21 (citing *United States v. McDonald*, 78 M.J. 376, 378 (C.A.A.F. 2019)). Accordingly, in order for Appellant to be not guilty of abusive sexual contact by reason of ignorance or mistake of fact, Appellant must have *reasonably* believed AJ consented. However, the evidence compellingly demonstrates any such belief would have been unreasonable. Appellant and AJ had no prior relationship and had only met that morning. Appellant's behavior was inappropriate in that

setting. AJ never told Appellant he could touch her; in fact, every time he touched her arm or leg she would shift away from him. AJ felt uncomfortable, and the three other witnesses present all testified that she appeared to be uncomfortable. There was no basis for Appellant to reasonably conclude AJ consented to have him rub her thigh.

### b. Sexual Assault and Attempted Sexual Assault of RA

The Government's proof of Appellant's guilt of sexual assault and attempted sexual assault of RA was also convincing. RA testified that Appellant penetrated her vagina with two fingers and "partially" penetrated her anus with another finger as she lay on her bed, weak and under the influence of strong painkillers, the day after her oral surgery. Although Appellant and RA had been friendly acquaintances, they had no prior sexual relationship, and RA testified she did not consent to Appellant's actions. A1C RC's testimony significantly corroborated RA's testimony by confirming Appellant's presence on RA's bed and suspicious behavior, and RA's weakened state. Her testimony was also powerfully reinforced by Appellant's statements in his AFOSI interview which, although self-serving, improbable, and outright false in certain respects, admitted that he had put his finger near her anus and penetrated her vagina with his fingers until he was interrupted by A1C RC.

On appeal, Appellant proposes that the version of events that he eventually provided to the AFOSI agents, in which RA not only consented but initiated the sexual activity, was the true version. In addition, Appellant emphasizes the gaps in RA's memory. It is true that RA acknowledged there were many gaps in her memory, and that the evidence indicated RA had conversations and sent texts on 24 and 25 October 2017 that she could not remember, including a text to Appellant at 0436 on 25 October 2017 asking him to come to her room. However, Appellant's arguments do not persuade us that the Government failed to prove Appellant's guilt beyond a reasonable doubt.

In addition to RA's testimony that she did not consent, the circumstances of the encounter and the multiple indications of Appellant's consciousness of guilt fatally undermine the believability of his account. The day prior, RA had oral surgery to remove her wisdom teeth. She was prescribed narcotic medicine for the pain. RA and A1C RC credibly testified that her cheeks were swollen and she seemed weak. A rational trier of fact could conclude it was unlikely that RA would aggressively initiate sexual activity with Appellant, overcoming his initial reluctance, under these circumstances. A rational trier of fact could reasonably find it far more plausible that Appellant took advantage of RA's vulnerability to gratify his own sexual desires. In addition, a rational trier of fact could reasonably consider that Appellant's initial self-serving lies during the AFOSI interview vitiate the credibility of his subsequent self-serving

claims, as well as suggest consciousness of guilt on Appellant's part. Appellant's spontaneous statement to RA's roommate, A1C JM, evidently made after A1C RC discovered Appellant in RA's bed, that RA was "hallucinating" also suggests his consciousness of guilt.

### c. Conclusion Regarding Legal and Factual Sufficiency

Accordingly, drawing every reasonable inference from the evidence of record in favor of the Government, we conclude the evidence was legally sufficient to support Appellant's convictions. *See Robinson*, 77 M.J. at 297–98. Additionally, having weighed the evidence in the record of trial and having made allowances for not having personally observed the witnesses, we are convinced of Appellant's guilt beyond a reasonable doubt. *See Turner*, 25 M.J. at 325.

## B. Findings Instructions

On appeal, Appellant asserts the military judge's findings instructions were erroneous in two respects. First, Appellant contends the military judge failed to provide adequate instructions with respect to mistake of fact and specific intent. Second, Appellant contends the military judge failed to ensure the members did not convict Appellant on an uncharged theory that RA was incapable of consenting to the sexual acts.

### 1. Additional Background

After the parties rested, the military judge discussed with counsel his proposed instructions for the court members on findings. The military judge identified attempted sexual assault as a lesser included offense for the specification alleging sexual assault by Appellant's finger penetrating RA's anus, and the parties agreed. As to defenses, the military judge identified consent and mistake of fact as to consent as having been raised with respect to both charged sexual assaults of RA; he identified only mistake of fact as to consent, and not actual consent, with respect to the charged abusive sexual contact of AJ. Again, the parties concurred, and the Defense specifically denied any request for instructions on other defenses.

The military judge then summarized the standard instructions from the *Military Judges' Benchbook*, Dept. of the Army Pamphlet 27-9 (10 Sep. 2014), he intended to provide to the court members. In doing so, the military judge briefly noted that he removed some of the standard language from the *Benchbook* with respect to the definition of persons who are incompetent to or incapable of providing consent, as defined in *United States v. Pease*, 74 M.J. 763, 770 (N.M. Ct. Crim. App. 2015), *aff'd*, 75 M.J. 180 (C.A.A.F. 2016). At several points, trial defense counsel affirmed that the Defense did not object to the proposed instructions. After the military judge concluded his summary, trial defense counsel clarified that the military judge had agreed to modify the *Pease*

instruction at the Defense's request during a conference pursuant to R.C.M. 802. Trial defense counsel provided the following explanation:

> [J]ust out of concern after two years of reading Appellate records, the language that was taken out was "an incompetent person is a person who lacks either the mental or physical ability to consent because he or she is (1) asleep or unconscious; (2) impaired by a drug intoxicant or other similar substance; or (3) suffering from a mental disease or defect or physical disability." The other three lines that were taken out are that "a person is 'incapable' of consenting when she lacks the cognitive ability to appreciate the sexual conduct in question or physical or mental ability to make or to communicate a decision about whether she agrees to the conduct." When we discussed these over lunch the defense requested that that that language be taken out.

Trial counsel confirmed the Government had concurred with the modification. The military judge then asked the Defense whether there was "anything else you want to be heard on." Trial defense counsel responded, "No, Your Honor."

The military judge provided the following instruction with regard to the defense of mistake of fact with regard to consent to the charged sexual assaults of RA:

> Now "mistake of fact" means that [Appellant] held as a result of ignorance or mistake an incorrect belief that the other person consented to the sexual conduct. The ignorance or mistake must have existed in the mind of [Appellant] and must have been reasonable under all the circumstances. Now, to be reasonable the ignorance or mistake must have been based on information or lack of information that would indicate to a reasonable person that the other person consented to the sexual conduct. Additionally, the ignorance or mistake cannot be based on the negligent failure to discover the true facts.

The military judge did not provide a separate mistake of fact instruction with respect to the lesser included offense of attempted sexual assault. With respect to abusive sexual contact of AJ, the military judge provided an instruction on mistake of fact as to consent that was substantially the same as with regard to the sexual assaults of RA, including the requirement that such a mistake "must have existed in the mind of [Appellant] and must have been reasonable under all the circumstances."

After the military judge delivered the findings instructions, he asked whether "either side ha[d] any objections to the instructions as given." Trial defense counsel responded, "No, Your Honor."

### 2. Law

Generally, we review the adequacy of the military judge's instructions de novo. *United States v. Dearing*, 63 M.J. 478, 482 (C.A.A.F. 2006) (citations omitted). However, the United States Court of Appeals for the Armed Forces (CAAF) has held that when an appellant affirmatively declines to object to the military judge's instructions, the issue is waived. *United States v. Davis*, 79 M.J. 329, 332 (C.A.A.F. 2020) (citations omitted). The CAAF will not review waived issues, because affirmative waiver leaves no error to correct on appeal. *Id.* (citation omitted). However, pursuant to Article 66(c), UCMJ, 10 U.S.C. § 866(c), the Courts of Criminal Appeals have the unique statutory responsibility to affirm only so much of the sentence that they find is correct and "should be approved." This includes the authority to address errors raised for the first time on appeal despite waiver of those errors at trial. *See, e.g.*, *United States v. Hardy*, 77 M.J. 438, 442–43 (C.A.A.F. 2018).

### 3. Analysis

#### a. Mistake of Fact and Specific Intent

Appellant asserts that the military judge failed to provide complete and accurate instructions with respect to mistake of fact. Appellant notes each of the charged offenses included an element that requires specific intent—that Appellant intended to gratify his sexual desire. In addition, the lesser included offense of attempt requires proof that Appellant acted with specific intent to commit sexual assault. Appellant also correctly notes, as described above with respect to factual and legal sufficiency, if the mistake goes to an element of the offense requiring specific intent, the mistake "need only have existed in the mind of the accused," regardless of whether the mistake was reasonable. R.C.M. 916(j)(1). Appellant asserts the instructions erroneously applied a reasonableness requirement for the mistake of fact defense, without accounting for those elements requiring a specific intent.

However, under *Davis*, Appellant waived this alleged instructional error. *See* 79 M.J. at 332. As in *Davis*, trial defense counsel "affirmatively declined to object to the military judge's instructions and offered no additional instructions," and thereby "affirmatively waived any objection." *Id.*

Appellant asks us to disregard the holding in *Davis*, arguing the case was wrongly decided. Appellant notes that under longstanding and recent precedent, prior to *Davis*, the CAAF had held that failure to object to instructions constituted forfeiture rather than waiver. *See, e.g.*, *United States v. Voorhees*, 79 M.J. 5, 15 (C.A.A.F. 2019) (citing *United States v. Haverty*, 76 M.J. 199, 208 (C.A.A.F. 2017) (reviewing for plain error where the defense did not object to the military judge's failure to provide a mens rea instruction); *see also* R.C.M.

920(f) ("Failure to object to an instruction or to omission of an instruction before the members close to deliberate constitutes waiver of the objection in the absence of plain error."). Appellant notes the CAAF has previously described waiver as the "intentional relinquishment of a known right," and asserts trial defense counsel's simple statement of no objection was insufficiently knowing and intentional to waive the asserted error. Furthermore, Appellant emphasizes that the military judge is more than an umpire, and has an independent, *sua sponte* duty to provide appropriate instructions. *See, e.g.*, *United States v. Andrews*, 77 M.J. 393, 403–04 (C.A.A.F. 2018); *United States v. Ober*, 66 M.J. 393, 405 (C.A.A.F. 2008). Appellant denies that the CAAF's decision in *Davis* is entitled to *stare decisis*, and implies that this court should not follow it. *See Andrews*, 77 M.J. at 399 (citation omitted) (explaining the court is not bound by precedent when there has been an error in legal analysis). Finally, Appellant asserts this court can also distinguish *Davis*, which he asserts did not address the military judge's independent duty to provide complete and accurate instructions.

Notwithstanding Appellant's arguments, we cannot meaningfully distinguish this case from *Davis*. Furthermore, we have no authority to disregard controlling precedent from our superior court. *See United States v. Allbery*, 44 M.J. 226, 228 (C.A.A.F. 1996) (holding the Court of Criminal Appeals was "absolutely" bound by a precedent-making decision of its superior court in the absence of a superseding statute or intervening decision). Accordingly, Appellant waived this alleged instructional error.

We have considered whether to exercise our authority under Article 66(c), UCMJ, to address the alleged error in spite of the waiver. *See Hardy*, 77 M.J. at 442–43. We decline to do so. The military judge and counsel for both parties agreed that the defense of mistake of fact had been raised with respect to the absence of consent. In both sexual assault by bodily harm and abusive sexual contact under Article 120, UCMJ, the absence of consent[6] is an element requiring only general intent. *See McDonald*, 78 M.J. at 378; *Lee*, unpub. op. at *21. Therefore, any mistake of fact as to consent was required to be both actual and reasonable, as the military judge correctly instructed the members. The military judge did not find the evidence raised the defense of mistake of fact with respect to the specific intent element of Appellant's own intent to gratify his sexual desire. Appellant does not explain what evidence raised the possibility of such a mistake. Similarly, with regard to the lesser included offense of attempted sexual assault, Appellant fails to explain how the evidence raised a question of his mistake regarding his own intention to commit sexual assault,

---

[6] All three specifications of which Appellant was convicted specifically alleged Appellant acted without the victim's consent.

apart from the general intent element of the absence of RA's consent. Accordingly, we are not persuaded the military judge's instruction on mistake of fact was either erroneous or unfairly prejudicial, and we decline to pierce Appellant's waiver to take corrective action.

### b. Capacity to Consent

Appellant further asserts the military judge failed to provide instructions sufficient to ensure the court members did not convict him of sexual assault and attempted sexual assault on a theory that was not charged—that RA was incapable of consenting to the sexual acts. *See MCM*, pt. IV, ¶ 45.a.(b)(3); ¶ 45.a.(g)(8). Appellant suggests the Government used evidence that RA was under the effects of Percocet at the time of the assault to suggest RA was unable to understand or remember events. Appellant acknowledges the Defense-requested modification to the standard *Pease* instruction was evidently an effort to mitigate this risk, but contends it was inadequate to prevent the "realistic probability the court members convicted [him] through a misunderstanding of the law and the charged offenses."

However, for the reasons stated above, under *Davis*, trial defense counsel's statement that the Defense had no objection to the instructions, and did not request additional instructions, waived the alleged error on appeal. *See Davis*, 79 M.J. at 332. We have again considered whether to exercise our authority under Article 66(c), UCMJ, to pierce the waiver and take corrective action, but we find no such action is warranted. The asserted error is without merit in any event. The military judge properly instructed the court members on the applicable elements of the charged offenses of sexual assault by causing bodily harm, and not on a theory of incapacity to consent. Court members are presumed to follow the military judge's instructions in the absence of evidence to the contrary. *See United States v. Taylor*, 53 M.J. 195, 198 (C.A.A.F. 2000) (citations omitted). We find no reason to conclude differently in the instant case.

## C. Post-Trial Delay

Appellant's court-martial concluded on 21 October 2018. However, the convening authority did not take action until 15 May 2019. This 145-day period exceeded by 25 days the 120-day threshold for a presumptively unreasonable post-trial delay the CAAF established in *United States v. Moreno*, 63 M.J. 129, 142 (C.A.A.F. 2006). Accordingly, we have considered the four factors the CAAF identified in *Moreno* to assess whether Appellant's due process right to timely post-trial and appellate review has been violated: "(1) the length of the delay; (2) the reasons for the delay; (3) the appellant's assertion of the right to timely review and appeal; and (4) prejudice." *Id.* at 135 (citing *United States v. Jones*, 61 M.J. 80, 83 (C.A.A.F. 2005); *Toohey v. United States*, 60 M.J. 100, 102 (C.A.A.F. 2004) (per curiam)). "We review de novo claims that an appellant has

been denied the due process right to a speedy post-trial review and appeal." *Id*. (citations omitted).

In *Moreno*, the CAAF identified three types of cognizable prejudice for purposes of an appellant's due process right to timely post-trial review: (1) oppressive incarceration; (2) anxiety and concern; and (3) impairment of the appellant's ability to present a defense at a rehearing. 63 M.J. at 138–39 (citations omitted). Where, as in this case, the appellant does not prevail on the substantive grounds of his appeal, there is no oppressive incarceration. *Id*. at 139. Similarly, where Appellant's substantive appeal fails, his ability to present a defense at a rehearing is not impaired. *Id*. at 140. With regard to anxiety and concern, "the appropriate test for the military justice system is to require an appellant to show particularized anxiety or concern that is distinguishable from the normal anxiety experienced by prisoners awaiting an appellate decision." *Id*. Appellant has made no claim or showing of such particularized anxiety or concern in this case, and we perceive none.

Where there is no qualifying prejudice from the delay, there is no due process violation unless the delay is so egregious as to "adversely affect the public's perception of the fairness and integrity of the military justice system." *United States v. Toohey*, 63 M.J. 353, 362 (C.A.A.F. 2006). The chronologies included with the record of trial indicate a primary cause of the delay was the fact that the court reporter did not begin transcribing the proceedings in Appellant's case until 12 February 2019. In the intervening time, the court reporter transcribed an earlier court-martial and a board of inquiry, and served as court reporter for two court-martial motions hearings. We further note Appellant's trial spanned six days and resulted in a substantial record of trial that included eight volumes and over 1,400 pages of transcript. We conclude that under the circumstances, the delay was not so egregious as to impugn the fairness and integrity of the military justice system, and we do not find a violation of Appellant's due process rights.

Recognizing our authority under Article 66(c), UCMJ, we have also considered whether relief for excessive post-trial delay is appropriate in this case even in the absence of a due process violation. *See Tardif*, 57 M.J. at 225. After considering the factors enumerated in *Gay*, 74 M.J. at 744, we conclude no such relief is appropriate.

## III. CONCLUSION

The approved findings and sentence are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a), 866(c).

Accordingly, the findings and sentence are **AFFIRMED**.



FOR THE COURT

CAROL K. JOYCE
Clerk of the Court


t